EDWARD A. MARWICK & others *vs.* JOHN P. ROGERS.

Suffolk. January 16, 1894. — February 26, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Maritime Law — General Average — Cesser Clause in Charter-party.*

The obligation to contribute to a general average loss, or to general average expenses, springs from the law itself, and not from any contract between the parties concerned, and rests upon the vessel, the cargo, and the freight in proportion to their respective values, and upon the owners of each in proportion to the value of their property at risk; and it may be enforced by resorting to a lien upon the property saved from the common peril, or by action against the persons bound to contribute.

A charter-party contained the following clause: " It is further agreed that all liability of charterers under the agreement shall cease as soon as the cargo is shipped on board. All questions, whether of demurrage or otherwise, to be settled with the consignees, the owner and captain looking to their lien on cargo for this purpose." *Held*, that, under this clause, the charterer, who was also the owner of the cargo, was not released from his obligation to contribute to the payment of general average expenses. MORTON, J. dissenting.

BARKER, J. This suit is brought by the owners of a barque to recover of the defendant, who was the charterer of the vessel and also owner of her cargo, his share of general average expenses. The declaration alleges, in substance, that the plaintiffs are owners of the vessel, that they made a contract of charter-party with the defendant to carry a general cargo of merchandise from Boston to Talcahuano; that in pursuance thereof the vessel was duly laden with a cargo owned by the defendant and sailed from port; that upon her voyage she sustained, from bad weather, heavy gales and a heavy sea, damages by which it be-

came necessary to put into a port of distress, where there were general average expenses amounting to the sum of $1,695.95, of which the cargo should bear its proportional part; that a certain proportion of this sum, but not the full amount, was thereafter paid by the owner of the cargo, which amount so paid the plaintiffs refused to receive in full settlement of the cargo's proportion of general average; that upon the arrival home of the vessel general average adjustments were duly made, in which the contribution of the cargo to the general average expenses amounted to the sum named, which sum was duly demanded of the defendant, who refused payment; and that at the time of the accident, and while the expenses were thus incurred, the defendant was the owner of the cargo. The charter-party was not set out in the declaration, but at the request of the defendant a copy of it was subsequently filed, and it thus appeared that it contained the following stipulation or cesser clause : " It is further agreed that all liability of charterers under the agreement shall cease as soon as the cargo is shipped on board. All questions, whether of demurrage or otherwise, to be settled with the consignees, the owner and captain looking to their lien on cargo for this purpose." Thereafter the defendant demurred, on the ground that it appeared in the charter-party that all his liability thereunder ceased as soon as the cargo was on board, and that all questions must be settled with the consignees, the owners and captain looking to their lien on cargo for this purpose, and that it appeared from the declaration that the alleged cause of action arose after the cargo had been shipped. This demurrer was sustained, and judgment ordered for the defendant, and the plaintiffs appealed to this court.

Upon the hearing of the appeal, the defendant, besides contending that he was freed by the clause quoted from any obligation to contribute personally to general average expenses, as the owner of the cargo or otherwise, also contended that it was implied by the declaration that there was an adjustment of the general average expenses at the port of distress, by which adjustment the plaintiffs were bound. But there is no allegation of such an adjustment, and the questions which might be raised if it had been pleaded are not open upon this demurrer. Nor is the question whether the clause quoted exonerates the defendant

from his obligation as owner of the cargo to contribute to general average expenses raised in due course of pleading. The declaration, while alleging that the plaintiffs made a contract of charter-party with the defendant, in pursuance of which the vessel was duly laden and sailed upon the voyage agreed upon, is not on the charter-party, but is on an obligation imposed by law upon the defendant as owner of the cargo. The proper course for the defendant was not to crave oyer of the contract; but, if he relied upon its provisions in defence, to plead the charter-party in his answer. If a correct course of pleading had been followed, the question of the effect of the stipulation upon the plaintiff's claim to contribution from the defendant as owner of the cargo would not have arisen until a later stage of the cause. But as the plaintiffs are content to accept and to argue the issue upon the pleadings as they stand, and as the decision of the question must be the same whether it is now dealt with or at a later stage of the cause, we have thought best now to dispose of it.

The obligation to contribute to a general average loss, or to general average expenses, springs from the law itself, and not from any contract between the parties concerned. See *Gage* v. *Libby*, 14 Allen, 261, 267, in which, after defining the obligation, Mr. Justice Gray says that those who are liable must contribute " in equity and justice, and by the express rule of the Rhodian law, preserved in the Pandects, from which the maritime law of all civilized nations on this subject is derived." See also *Burton* v. *English*, 12 Q. B. D. 218, 220, where Lord Brett says of the obligation, " I do not think that it forms any part of the contract to carry, and that it does not arise from any contract at all, but from the old Rhodian laws, and has become incorporated into the law of England as the law of the ocean. It is not as a matter of contract, but in consequence of a common danger, where natural justice requires that all should contribute to indemnify for the loss of property which is sacrificed by one in order that the whole adventure may be saved. If this be so, the liability to contribute does not arise out of any contract at all." See also *Sturgis* v. *Cary*, 2 Curtis, C. C. 382, 384; *Anderson* v. *Ocean Steamship Co.* 10 App. Cas. 107, 114; Abbott, Shipping, (13th ed.) 626.

The obligation rests upon the vessel, the cargo, and the freight, in proportion to their respective values, and upon the owners of each in proportion to the value of their property at risk; and it may be enforced by resorting to a lien upon the property saved from the common peril, or by action against the persons bound to contribute. See Abbott, Shipping, (13th ed.) 657; *Anderson* v. *Ocean Steamship Co.* 10 App. Cas. 107, 115.

The declaration taken by itself, therefore, states a good cause of action, springing from the duty cast upon the defendant by the law to contribute in payment of general average expenses in proportion to the value of his cargo; and the question for decision is, whether the stipulation of the charter-party frees him from this obligation. In the opinion of a majority of the court it does not.

It is to be observed that no explicit agreement of this charter-party placed the defendant or his property in such a relation to the vessel or to the adventure that he was thereby rendered liable to general average contributions. Under no circumstances could the plaintiffs recover of him such a contribution by an action upon the charter-party as a written agreement the terms of which bound him to make such a contribution. He agreed to furnish the vessel a full cargo of lawful merchandise, to pay a stipulated sum for the charter or freight of the vessel during the voyage on the proper delivery of the cargo at the port of destination, and to pay demurrage at a stipulated rate in case the vessel should be detained longer than the agreed lay days, either in loading or discharging. But he made no advance payment of freight, and so did not become its owner in part or in whole, and he was not required to be the owner of any part of the cargo. There was nothing in his agreements which constituted him an owner either of cargo or of freight, or which required him to become such an owner, or which placed him in such a position as to make him liable to general average charges. As charterer he was not so liable. The duty rests only upon the owners of vessel, cargo, and freight; and he could perform all his agreements without incurring that obligation. His agreements to pay the freight, and to pay for the detention of the vessel at the port of discharge, could only be performed after the cargo was on board. These agree-

ments were matters arising under the charter-party itself, which afforded a field for the operation of the clause the meaning of which is now in question, and its operation is naturally limited to that field. What the parties agree is, that all the defendant's liability under the charter-party shall cease as soon as the cargo is shipped on board; and the final sentence, " All questions, whether of demurrage or otherwise, to be settled with the consignees, the owner and captain looking to their lien on cargo for this purpose," is to be read in the light of this agreement. It does not extend the waiver of his liability, and is to be construed as dealing only with questions arising under the charter-party. To give to the stipulation the meaning for which the defendant contends, and to construe it as releasing him from obligations which are not imposed by the charter-party but by the law itself, and which are incidental not to his position as charterer but to his ownership of the cargo, a relation as to which the charter-party is silent, permitting him to furnish a cargo of which he may not be the owner, would be to strain the language of the contract, and to do violence to what we think from the whole instrument was the intention of the parties; — namely, to free the charterer, upon his furnishing a full cargo, from possible liabilities cast upon him by the terms of the charter-party, which by its terms he might otherwise personally be called upon to discharge after the full cargo had been shipped on board. By force of its provisions, although he had agreed in terms to make certain future payments if they should be earned by the vessel, he was exonerated from any personal obligation to make them when he had put a full cargo on board, and the owners of the vessel agreed in that case thereafter to look for those payments only to the cargo and to its consignees.

Such stipulations, or cesser clauses, are not unusual in charter-parties, and questions of the obligation to pay freight, or demurrage, or damages for detention, when the charter-party contains such a clause, have frequently been before the courts, especially in England. See Abbott, Shipping, (13th ed.) 226–238, and cases there cited. So far as we are aware, the effect of such a stipulation upon the liability of a charterer to contribute as owner of cargo to a general average loss has not been considered by the English courts. But the case of *Gullischen* v. *Stewart,* 11 Q. B. D. 186,

and 13 Q. B. D. 317, holds that a cesser clause does not exonerate a charterer who is also consignee from a liability imposed upon him not as charterer but as consignee; and the charterer was there held liable as consignee, in respect of delay at the port of discharge, although it was stipulated by a cesser clause in the charter-party that the charterer's liability should cease as soon as the cargo was on board. Since the argument our attention has been called to the case of *The Eliza Lines,* 61 Fed. Rep. 308, 325, in which the Circuit Court of the United States for the First Circuit very recently has held that, if the charterer is also owner of the cargo under bills of lading, a cesser clause does not exonerate him from contributing to a general average loss.

It is possible that a charterer, by prepaying the freight without a right to repayment in case of loss, or in other ways, may become in whole or in part its owner. See *Frayes* v. *Worms,* 19 C. B. (N. S.) 159, 174, 175. Whether in such a case the cesser clause should exonerate him from contributing, as owner of freight, to a general average loss, we do not now decide. Such a liability, which, while imposed by the law, might be said to arise in consequence of the position in which the terms of the charter-party place him as owner of freight, may perhaps be more readily considered as within the cesser clause than his liability as owner of the cargo, a relation which he is not bound to take by virtue of any term of his contract. While it is, plain that in any voyage general average losses or expenses may be incurred by some parties to the adventure, we are not able to assent to the conclusion that the liability to which they give rise is one which can fairly be impliedly written into every charter-party, or one with which the cesser clause now in question was meant to deal. Unless in cases where by the terms of the charter-party the charterer is put into such a relation to the other persons who are obliged to make or are entitled to receive contribution to a general average loss or to general average expenses that the necessary result of the contract is that he is liable to make such contribution if a general average loss occurs, we cannot assent to the doctrine that he is released by the cesser clause from an obligation which the law imposes, not because he is the charterer of the vessel, but because he is the owner of the cargo.

There are other considerations which tend to strengthen this

conclusion. The duty which rests upon the parties concerned is one imposed by the law itself, and it is not a matter of course that one upon whom a duty is so cast may contract himself wholly out of the obligation, though he may stipulate for some other rule of adjustment than that of the place of the contract. Certainly an owner of cargo cannot by a contract with the owner of the vessel be relieved from this obligation to other owners of cargo or to other owners of freight. By the necessity of the case, when a general average act is to be done it must be done by the authority of the master, who is selected and paid by the owners of the vessel, and who stands in a closer relation to them than to the owners of the cargo. Yet, in deciding upon the general average act, he is from necessity deemed to be the agent alike of the owners of the vessel, of the cargo, and of the freight; and the fact that the owner of the cargo is exonerated from contributing to make good the loss to be occasioned by the master's act may tend to bias him in his decisions, and so may unreasonably imperil the whole adventure. If the owner of the cargo is exonerated from contributing to general average losses, he must also be held to have no right to claim such contribution from others; a consequence which is not to be implied from an agreement like the present charter-party. Insurance of vessel, freight, and cargo has long been a usual incident of maritime adventures, and in case of an abandonment to the underwriters after a general average loss the insurers are substituted to the right of the assured to contribution for such losses. But the mutual relinquishment of the right of contribution by the owners of the vessel and of the cargo, or its relinquishment by either, may avoid insurance, and prevent recourse to underwriters, a result which we cannot believe was contemplated by either party to the present charter. See *Schmidt* v. *Royal Mail Steamship Co.* 45 L. J. (Q. B.) 646, and *Crooks* v. *Allan*, 5 Q. B. D. 38, 40. In the case last cited it was held that a stipulation inserted by the owners of a vessel in a bill of lading, to the effect that they were not to be liable for any damage which was capable of being covered by insurance, and which stipulation they contended had the effect to exonerate them and their vessel from liability to contribute to general average losses, did not so relieve them, because " the office of the bill of lading is to provide

for the rights and liabilities of the parties in reference to the contract to carry, and is not concerned with liabilities to contribution in general average, and unless the contrary appears, the words used must be so construed." The present case is so analogous to that decided in *Crooks* v. *Allan* as to make that case an authority for the conclusion to which we have come. A charter-party is no more concerned than is a bill of lading with liabilities growing out of general average, nor is there more reason for construing it as dealing with them, when it does not do so in express terms. In *Clink* v. *Radford*, [1891] 1 Q. B. 625, in holding that the cesser clause did not exempt the charterers from liability for delay at the port of loading, because no lien was given by the charter-party for damages for such delay, it was said by Fry, L. J., that " the clause does not say that all the charterer's liability is to cease, nor simply the charterer's liability, but the charterer's liability under the charter-party." See also *Dunlop* v. *Balfour*, [1892] 1 Q. B. 507 ; *Hansen* v. *Harrold*, [1894] 1 Q. B. 612. The charter-party upon which the defendant relies was made by filling out a printed blank, as is commonly the case in making such instruments; and in construing it due regard should be given to the incidental effect which our construction may have upon the rights of other persons who make use of such blanks ; and we think that in the mercantile world such cesser clauses have not been deemed to have any relation to questions of general average, or to do more than to regulate the liabilities of the charterer under the charter-party.

We are aware that in the earlier decisions upon cesser clauses there are found general expressions to the effect that by their operation the charterer is exonerated from all future liability when the cargo is laden. See Abbott, Shipping, (13th ed.) 226–238, and cases there cited. But the present English doctrine is that even as to breaches of the charter-party itself the clause will be construed as inapplicable, if by construing it otherwise the shipowner would be left unprotected. See *Clink* v. *Radford*, *Dunlop* v. *Balfour*, and *Hansen* v. *Harrold*, *ubi supra*.

And in the English cases generally it should be noticed that the courts were dealing with liabilities of the charterer as charterer, arising under the contract itself, and the general terms used in such decisions are to be qualified by that fact, and do

not intend to hold that the charterer is exonerated from outside liabilities imposed upon him by the law, when he assumes, and because he assumes, an additional relation to the adventure as owner of the cargo.

In the opinion of a majority of the court the entry must be,
*Judgment for defendant set aside, and demurrer overruled.*

MORTON, J. I am sensible of the weight to which the conclusion reached by the rest of the court is entitled, and it is with regret that, after much consideration, I find myself unable to concur in it, or to suffer the opinion to go without a dissent.

Charter-party contracts are, in the broadest sense of the words, commercial contracts, and should be construed, if possible, in harmony with mercantile usage and understanding when these are not contrary to law. Where there is manifestly but one construction of the language used, the parties must of course abide by that construction. But where, as here, the question relates to a clause of a peculiar character, the language of which is not free from ambiguity, such a construction should be adopted, if it can be, as will be fair and reasonable, having regard to the mutual interests of the parties, and to the main object of the contract. *Dahl* v. *Nelson*, 6 App. Cas. 38, 59. *Crookewit* v. *Fletcher*, 26 L. J. (Ex.) 153, 159.

The introduction of cesser clauses into charter-party contracts was due to the fact that frequently the charterer was only an agent, whose interest in the cargo ceased after it was shipped on board, or was a merchant who expected to dispose of the cargo while afloat, and both of whom naturally would desire to be relieved from liability to the shipowner for anything happening to the ship during the voyage. Abbott, Shipping, (13th ed.) 226, 227. *Gray* v. *Carr*, L. R. 6 Q. B. 522, 527. There was also the consideration that, if anything happened to the ship, the matter probably could be adjusted better by the consignee than by the charterer, who might be remote from the port of repair or destination. Generally coupled with the waiver of the personal liability of the charterer is an agreement, on the part of the shipowner or captain, to look to his lien on the cargo, or to the consignee, or both.

There is nothing unfair, nor unreasonable, nor at variance

with any principle of law, in an agreement of such a character when understandingly entered into, and there is no reason why a different rule of construction should be applied to it from that which is ordinarily applied to contracts. The charterer may contract properly enough to be absolved from personal liability for anything happening to the ship after the voyage is begun. The shipowner may agree to rely on his lien on the cargo, and well may be content with that security. If anything occurs by which he loses it, that is one of the risks which he takes.

The effect of cesser clauses has been much more considered in England, where they appear to have been originally introduced, than in this country, and the inclination of the English courts, at the outset, was to construe them strictly. More recently, however, the rule has been laid down, that where the shipowner has a lien co-extensive with the liability, which for aught that appears was the case here, the effect of the cesser clause will be to relieve the charterer. *Clink* v. *Radford*, [1891] 1 Q. B. 625. *Dunlop* v. *Balfour*, [1892] 1 Q. B. 507. *Hansen* v. *Harrold*, [1894] 1 Q. B. 612. This rule has been declared to be "a most rational one." Per Fry, L. J., *Clink* v. *Radford, ubi supra*, 632. And in the same case the Master of the Rolls said that, if the shipowner has a remedy for his loss, "we should construe the cesser clause in its fullest possible meaning, and say that the charterer is released." *Ibid.* 627.

No case appears to have come before any court, either in this country or in England, in which the question has been considered, of the effect of a cesser clause in a charter-party upon the liability of the charterer, who was the owner of the cargo, for a general average loss occurring to the ship, and for which the shipowner had a lien on the cargo, which is this case. The cases that have arisen have related mostly to claims for detention, or delay in loading or unloading, or for not furnishing a full cargo; and, although they deal in the main with breaches of express agreements contained in the charter-party, I do not see why the rule finally established by the English courts is not a sound one, nor why it should not be applied in the case before us.

The plaintiffs in substance contend that the application of the cesser clause must be limited to liabilities created by the charter-

party; and that this case does not come within the operation of the cesser clause, because, as they further contend, the obligation to contribute to a general average loss is not expressed or implied in the charter-party, and does not depend on a contract, but grows out of a law of the sea that those who have received a common benefit from a sacrifice voluntarily made in a common adventure shall share the loss so occasioned. But, whatever the origin of the rule requiring contribution in case of a general average loss, it has been long established as part and parcel of the maritime law, and every contract for the carriage of goods by sea must be assumed to be made with reference to it. In *Anderson* v. *Ocean Steamship Co.* 10 App. Cas. 107, 115, which was an action to recover a contribution to a general average loss which it was alleged the defendants promised that they would contribute and pay, Lord Blackburn said, " The promise . . . would be implied by law in every contract for the carriage of goods." See also *Wright* v. *Marwood*, 7 Q. B. D. 62, 67, per Bramwell, L. J. But this case does turn, it seems to me, on the question whether the liability of the defendants as owners of the cargo to contribute to a general average loss occurring to the ship is implied in the contract, or whether an action for the recovery of the contribution sued for could be maintained on the charter-party. The parties must be held to have contracted with the knowledge and understanding that there was a liability on the part of the charterer, as owner of the cargo, to contribute to general average losses and expenses sustained by the ship, if such should occur during the voyage. The shipowners could absolve the charterers from this liability, although created by law and not by contract, if they saw fit to do so. And the question therefore is, What did the parties intend by the cesser clause which they put into this contract? Did they mean to confine its operation to freight and demurrage, which are the only liabilities on the part of the charterer expressly created by the charter-party to which it could apply, or did they mean to include in it liabilities on the part of the charterer which might arise by reason of anything happening to the ship while it was engaged in transporting the cargo, to which the charter-party related, and for which liabilities the shipowner would also have a lien on the cargo? I think that they meant the latter, and that that is

the fair and reasonable construction. The main object of the charter-party was to secure the transportation of the cargo which the defendant was to furnish. The freight and demurrage were payable in respect of that, and nothing else. No claim for contribution to a general average loss can exist, unless there is a contract, express or implied, for the carriage of the goods on account of which it is made; and it is well settled that the shipowner has a lien on the cargo for general average losses and expenses occurring to the ship. Is it then reasonable to suppose that, when the parties stipulated by the cesser clause that " all questions, whether of demurrage or otherwise," should " be settled with the consignees, the owner and captain looking to their lien on cargo for this purpose," they meant to include the express liability of the charterers to the shipowners for freight and demurrage for which there was a lien, and did not intend to include the liability, which all parties understood might arise, of the charterers to the shipowners on account of the cargo shipped by them for a general average loss to the ship, and which no one could estimate, and which if it arose would be equally secured by a lien? There is nothing in the nature of a claim for general average which gives it a higher standing than a claim for freight or demurrage. No good reason can be given why, on principle, a liability on the part of the charterer to contribute as owner of the cargo to a general average loss occurring to the ship, which is secured on the part of the shipowner by a lien on the cargo, should be treated any differently from a liability for freight or demurrage, which is also secured by a lien on the cargo. The clause should not be construed strictly and narrowly. The words used are inclusive rather than restrictive. The language is " all liability of charterers under the agreement," and " all questions, whether of demurrage or otherwise." The parties intended, I think, that after the cargo was on board the charterers should be absolved from personal liability in respect of it for anything happening to the ship after the voyage was begun for which the shipowner or captain would have a lien on the cargo, and that if anything did happen the owner and captain were to look to their lien on the cargo and to the consignees, and not to the charterers. This is the result, as I understand them, of the English decisions. A claim upon the charterers,

as owners of the cargo, for a general average loss to the ship occurring while the cargo was being transported to its destination in accordance with the contract, and to secure the carriage of which was the main object of the contract, fairly may be said to be a liability arising under the agreement, and to come within its scope.

There are cases in which it has been held that the cesser clause did not extend to liabilities under a bill of lading received by the charterer of the cargo to be conveyed under the charter. *The Eliza Lines*, 61 Fed. Rep. 308, 325, 326. *Gullischen* v. *Stewart*, 11 Q. B. D. 186, and 13 Q. B. D. 317. But that was because the bill of lading was regarded as a separate and independent contract, just as a draft or bill of exchange for the freight would be. There is no such question here, and those cases, therefore, do not affect the construction of the clause under consideration. The case of *Crooks* v. *Allan*, 5 Q. B. D. 38, 40, stands on its particular facts; though it assumes that, even under a bill of lading, there may be an exemption from liability to a general average loss, if that is the effect of the contract, and the parties so understand it. Besides, the case, if not a subject of its criticism, is far from having been approved by this court. *Wamsutta Mills* v. *Old Colony Steamboat Co.* 137 Mass. 471.

Some general considerations respecting the right of contribution between owners of a cargo for a general average loss, and respecting the effect upon the insurance of the vessel and cargo of construing the cesser clause so as to include such a loss, are adduced in the opinion of the majority of the court as fortifying the conclusion there reached. They do not seem to me to do so, but rather to obscure the real issue. This case comes before us on the defendant's demurrer to the plaintiffs' declaration, of which the charter-party is to be taken, for the purposes of this case, as forming a part. The declaration alleges that the ship was laden with a cargo that belonged to the defendant, and that at the time when the accident happened to the ship, and the expenses were incurred, the defendant was the owner of the cargo. No other person, so far as appears, was an owner of or interested in the cargo with him. The question is, first, whether a charterer, who is the owner of the cargo, can agree

with the shipowner that the latter will waive the personal liability of the former in respect of the cargo for a general average loss occurring to the ship, and look to his lien on the cargo; and, secondly, whether that is the effect of the cesser clause in this case. The case does not involve, in any aspect of it, the question of contribution between the owners of a cargo, or between the respective owners of the cargo and of the ship, for a general average loss occurring by reason of a sacrifice of a part of the cargo. But it stands precisely as it would stand if all the owners of a cargo were also the charterers of the ship, and the charter-party contained a clause which it was alleged constituted an agreement on the part of the shipowner to look to his lien on the cargo, and to waive the personal liability of the charterers in respect of the cargo, for a general average loss occurring to the ship. How can the construction of such an agreement be affected by any considerations as to the rights of the parties to contribute under a different state of facts? Undoubtedly a shipowner cannot release an owner of a part of a cargo from the liability to contribute to other owners of the cargo. But the shipowner does not undertake to do that in this case; but only to release his own right of contribution for a general average loss occurring to the ship, and to look to his lien on the cargo for it. Neither do I see how the matter of insurance affords any light. If after insurance is effected the owners of the ship and cargo enter into any agreement which impairs the right of subrogation which the insurer would have in case of loss, it is possible that the policy might be avoided to that extent. But there is nothing to show that there was any insurance here, and presumably insurance is not usually effected till after the charter-party contract is entered into, and the cargo is on board.

I think that the ruling was right, and that the demurrer should be sustained.

*E. P. Carver*, for the plaintiffs.

*R. Stone*, for the defendant.