## WELLMAN et al. v. MORSE et al.

### (Circuit Court of Appeals, First Circuit. September 15, 1896.)

### No. 151.

1. GENERAL AVERAGE—PERSONAL LIABILITY.
   The owners of a cargo are liable on an implied promise for general average.
2. SAME.
   Where a master, in order to preserve his cargo, takes measures such as a wise and prudent man would think most conducive to the benefit of all concerned, he has a lien on the cargo for the expenses so incurred.
3. SAME—LIEN.
   The lien for general average is one recognized by the admiralty law, and stands on the same footing as a maritime lien on cargo for the price of its transportation.
4. SAME.
   The lien may be preserved by a qualified or conditional discharge of the cargo.
5. SAME.
   Though, strictly, the right to payment of general average does not, perhaps, always await a discharge of the cargo, yet no admiralty court will enforce payment prior to an opportunity for an inspection of the cargo by its owner for the purpose of determining its contributory value, so that, practically, a prior discharge of the cargo is necessary to enable the owner of the vessel to collect the amount due for general average.
6. SAME.
   The owner of a vessel cannot ordinarily retain the cargo aboard for nonpayment of freight, and thereupon charge demurrage arising from such detention.
7. SAME—BOND.
   An average bond should be conditioned in the simplest terms to pay the obligor's share of general average, and it is improper to demand a bond requiring more than this, or which would in any way prejudice the owner of the cargo in denying liability, or in questioning the amount of it, or which would close any of the methods which the law gives for determining the existence or extent of liability.
8. SAME.
   The cargo owner cannot insist that the bond shall provide for a postponement of any suit against the sureties until the end of litigation with the consignees.

Appeal from the District Court of the United States for the District of Massachusetts.

Eugene P. Carver (Edward E. Blodgett on brief), for appellants.

A. Nathan Williams, for appellees.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. There are only two substantial questions in this case. The others which have been presented so easily sift out, when understood with reference to settled maritime usages and fundamental principles of maritime law, that they do not require discussion by us. The court below allowed the schooner involved in this controversy the equivalent of six days' demurrage on a cargo of cypress lumber, transported from Appalachicola to Lynn, the claim having arisen through detention of the cargo aboard the schooner pending the improper refusal of its owners to sign a general average bond. Freight, as usual, was payable on proper de-

livery of cargo. The charter party provided that the cargo should be "received and delivered alongside, within reach of the vessel's tackles." This fact it is necessary to note, because the charterers had the privilege of discharging at Providence, Boston, or Lynn, and at Lynn the vessel could only discharge into lighters, which was according to the custom of that port. By the effect of the charter the owners of the cargo were to furnish the lighters; and a discharge into them, without some reservation, would undoubtedly have released all liens for freight and general average. The bill of lading in no way departed from the charter party, but contained the usual provision that Wellman, Hall & Co., who were named in the bill of lading as the consignees, and were in fact the owners of the cargo, should pay freight "with primage and average accustomed." They were the libelees against whom the owners of the schooner proceeded for demurrage in the court below, and they are the appellants in the record now before us.

Some controversy arises as to the meaning of the words "average accustomed" in the bill of lading, the owners of the schooner claiming it has no reference to any sums due for general average. Hopkins, Port of Refuge, 164; Carv. Carr. by Sea (2d Ed.) 597; and Kay, Shipm. (2d Ed.) 34. They follow this up by claiming that they would have been without remedy if they had delivered the cargo from their vessel without first obtaining a general average bond. They are clearly wrong in this proposition as a whole, because there can be no question that the owners of the cargo, against whom this libel was brought in the court below, would have been liable at common law, as owners, on an implied promise, for the general average. This is so well settled that it is not necessary to cite authorities in regard thereto; but we refer to Sturgis v. Cary, 2 Curt. 382, 384, Fed. Cas. No. 13,-573 (cited in Ralli v. Troop, 157 U. S. 386, 409, 15 Sup. Ct. 657); Marwick v. Rogers, 163 Mass. 50, 39 N. E. 780 (especially to the cases cited at page 52, 163 Mass., and page 781, 39 N. E.); and Carv. Carr. by Sea (2d Ed.) 436. They also had a lien for their general average charges, which would not have been lost by a qualified discharge, promptly followed by legal proceedings if the amount due for average had not been promptly paid. That they had a lien of some sort is recognized everywhere. Kay, Shipm. (2d Ed.) 199; Carv. Carr. by Sea (2d Ed.) 434; and Abb. Shipp. (13th Ed.) 446. Indeed, Leggett on Charter Parties, at page 531, lays down the broad rule, which is undoubtedly correct, that, "where a master, in order to preserve his cargo, takes measures such as a wise and prudent man would think most conducive to the benefit of all concerned, he has a lien on it for the expenses so incurred." This was doubted in Huth v. Lamport, 16 Q. B. Div. 442, but was held to be clear when the same case came before the court of appeal (16 Q. B. Div. 735, 736); and it was also so stated without hesitation in Svendsen v. Wallace, 10 App. Cas. 404, 409, 410. There is also no question that this lien has the advantages of a lien at common law; but, as it arises strictly out of maritime transactions, there is no reason why it should not also attach to itself some of the privileges of a maritime lien. Bags of Linseed, 1 Black, 108, settled the law to that effect in this country on a basis from

which there never has been any practical departure. The opinion of the court related directly to a question of freight. On page 112, Chief Justice Taney says that the lien for freight "is analogous to the lien given by the common law to the carrier on land." He is careful not to confound it with the latter. On page 113 he cites Dupont v. Vance, 19 How. 162, 171, and, referring to the earlier case of Cutler v. Rae, 7 How. 729, he says:

"In the last-mentioned case, the court, speaking of the lien for general average, and referring to the decision of Cutler v. Rae on that point, said: 'This admits the existence of a lien arising out of the admiralty law, but puts it on the same footing as a maritime lien on cargo for the price of its transportation, which, as is well known, is waived by an authorized delivery without insisting on payment.' "

This supports the proposition that the lien for general average is one "arising out of the admiralty law," "on the same footing as a maritime lien on cargo for the price of its transportation." But in Bags of Linseed the court held, undoubtedly, that a lien for freight is waived by an unqualified delivery of the cargo. This has been ever since understood to be the law, based on a double proposition: First, that by an unqualified delivery the owner of the vessel impliedly waives his lien; and, second, that there is a necessity, in the interests of trade and of innocent purchasers, of relieving merchandise from secret incumbrances. Yet, at this point, the character of the lien for freight and of that for general average as having a maritime nature, is made to appear by what the chief justice says on page 114. His language is limited to amounts due for freight; but, having already put freight and general average on the same footing, it was not necessary for him to continue to restate the parallel in order to make it effectual. He says:

"But courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. And it often happens that the necessities and usages of trade require that the cargo shall pass into the hands of the consignee before he pays the freight. It is the interest of the shipowner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery. And it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty. The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by the fault of the ship. It is his duty, and not that of the shipowner, to provide a suitable and safe place on shore in which they may be stored; and several days are often consumed in unloading and storing the cargo of a large merchant vessel. And if the cargo cannot be unladen and placed in the warehouse of the consignee, without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the shipowner and the merchant. It is true that such a delivery, without any condition or qualification annexed, would be a waiver of the lien, because, as we have already said, the lien is but an incident to the possession, with the right to retain. But in cases of the kind above mentioned it is frequently (perhaps more usually) understood between the parties that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and that the shipowner reserves the right to proceed in rem to enforce it, if the

freight is not paid. And if it appears by the evidence that such an understanding did exist between the parties, before or at the time the cargo was placed in the hands of the consignee, or if such an understanding is plainly to be inferred from the established local usage of the port, a court of admiralty will regard the transaction as a deposit of the goods, for the time. in the warehouse, and not as an absolute delivery; and, on that ground, will consider the shipowner as still constructively in possession, so far as to preserve his lien and his remedy in rem."

The owners of the schooner urge strenuously Cutler v. Rae, ubi supra, as demonstrating that they could not have retained their lien on the cargo for general average without actually retaining the cargo aboard their vessel. Some expressions in that case sustain that proposition, and would also lead even to the extent of maintaining that the subject matter is not one of admiralty jurisdiction; but the substantial effect of the decision was merely to hold that a consignee, as such, is not liable in admiralty for general average merely because he receives the cargo into his hands, and also that the lien is lost by an unqualified delivery to him. Dupont v. Vance, 19 How. 171.

Cutler v. Rae was decided at the January term, 1849. The opinion of the court was delivered by Chief Justice Taney, who also delivered the opinion in Bags of Linseed, decided at the December term, 1861, 12 years afterwards. It is clear that he then took occasion to reconsider Cutler v. Rae, if it needed reconsideration, and, if it did not, to remove misapprehensions as to its effect; and since Bags of Linseed, the law as stated therein has been practically acquiesced in by the supreme court and the admiralty bar. Judge Butler, in National Underwriters v. Melchers, 45 Fed. 643, 645, 646, has pointedly stated this latter fact, and also shown that the expressions in Cutler v. Rae, relied on by the owners of the schooner in this case, were neither argued nor presented, and were a surprise to the profession.[1] The courts ought no longer to consider themselves embarrassed by them, especially since Insurance Co. v. Dunham, 11 Wall. 1, establishing jurisdiction in admiralty over insurance policies, and thus wiping out all the inharmonious distinctions which have crept into the English admiralty, and placing our admiralty jurisprudence on a broad principle embracing everything properly of a maritime nature. It is true that in England the liens for freight and general average are still regarded as arising strictly at common law, and, therefore, except as otherwise provided in the merchant shipping acts, incapable of reservation in admiralty in the way pointed out in Bags of Linseed. Carv. Carr. by Sea (2d Ed.) 437; Leggett, Charter Parties, 520. But the ancient maritime law established more just rules. Abb. Shipp. (13th Ed.) 446; Goirand's French Code of Commerce, arts. 305, 306. Therefore, although in Bags of Linseed the observations which we have quoted as to the reservation of a lien to a qualified extent were not strictly in point, because in that case there had been an unconditional delivery of the cargo, yet the long acquiescence to which we have referred, and the fact that the

---

[1] That Judge Butler was in error, at least in part, in his statement, appears from the appendix to 8 How. 615. PUTNAM, J.

rule there stated is in harmony with the ancient maritime law, give it the force of authority. The nature of this qualified lien has been somewhat differently stated. Chief Justice Taney, as we have already noted, said that it is analogous to the common-law lien. In The Bird of Paradise, 5 Wall. 545, 555, Mr. Justice Clifford, speaking for the court, said that it is regarded in the jurisprudence of the United States as a maritime lien, although he added that it is not the same as the privileged claim of the civil law, and stands on the same ground with the lien of the carrier on land, and is lost by an unconditional delivery. In The Eddy, 5 Wall. 481, 494, speaking again in behalf of the court, he said:

This lien "is not 'the privileged claim' of the civil law, but it arises merely from the right of the shipowner to retain the possession of the goods until the freight is paid, and therefore it is lost by an unconditional delivery of the goods to the consignee."

But in The Maggie Hammond, 9 Wall. 435, 450, he used the following language:

"Shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo contracts to pay the freight and charges, and to the fulfillment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement."

In The Delaware, 14 Wall. 579, 596, the same learned judge, speaking in behalf of the court, said:

"Shipowners, as carriers of merchandise, contract for the safe custody, due transport, and right delivery of the goods; and the shipper, consignee, or owner of the cargo contracts to pay the freight and charges; and by the maritime law, as expounded by the decisions of this court, the obligations of the shipowner and the shipper are reciprocal; and it is equally well settled that the maritime law creates reciprocal liens for the enforcement of those obligations, unless the lien is waived by some express stipulation, or is displaced by some inconsistent and irreconcilable provision in the charter party or bill of lading."

The latest expression is that of Mr. Justice Gray, speaking in behalf of the court, in Ralli v. Troop, already cited, 157 U. S., at page 400, 15 Sup. Ct. 662, as follows:

"After a voluntary sacrifice of part of the adventure, and a consequent escape of the rest from imminent peril, the owner of the ship (or, in his absence, the master as his agent) has the duty of having an adjustment made of the general average, and has a maritime lien on the interests saved and remaining in his possession for the amount due in contribution to the owner of the ship; and the owner of goods sacrificed has a corresponding lien on what is saved for the amount due to him."

We need not, however, pursue the matter further. We have said enough to make it clear that the owners of the schooner not only had a right of action against Wellman, Hall & Company, on an implied promise at common law, but also a lien which, if properly reserved, would have followed the goods. Therefore, we state it to be well settled that they might have safely discharged the cargo into the lighter of its owners, and have permitted it to have been landed on the wharf of the latter, and yet have retained their lien for the general aver-

age, which lien the admiralty courts would have enforced, provided the same had been promptly prosecuted if not promptly paid. The interests of commerce require that we should not leave our views on this proposition in doubt.

But there are other difficulties standing in the way of the owners of the schooner on this part of the case. There can be no question that, under this charter party and bill of lading, freight was due only concurrently with the delivery of the cargo with an opportunity to inspect it. There could be no delivery and inspection so long as it remained aboard. With reference to the payment of general average, the owners of the schooner were, according to strict law, theoretically entitled to receive it in cash before surrendering their lien, and were not holden to take security for it; and the owners of the cargo were likewise, by the same strict law, entitled theoretically to pay in money instead of giving security. Although, according to strict law, the right to payment of general average does not, perhaps, always await a discharge of the cargo (Carv. Carr. by Sea, 426–428), yet no admiralty court would enforce payment prior to an opportunity for its inspection by its owner for the purpose of determining its contributory value. This, nevertheless, would not prevent the filing of a libel in season to make good the lien if it became necessary. So that, practically, a prior discharge of the cargo is, in any event, necessary to enable the owner of the vessel to collect the amount due for general average. It was on this account well said, referring to payments alike for freight and general average, in Abb. Shipp. (13th Ed.) 446, as follows:

"The master, however, cannot detain the goods on board the ship until these payments are made, as the merchant would then have no opportunity of examining their condition."

Also, with reference to general average, it is expressly stated in Lown. Gen. Av. (4th Ed.) 329, that if the master "retains the goods on board his ship he can claim no demurrage during the delay." All the authorities, as well as the reason of the law and the necessities of commerce, are to the same effect. The same rule exists under the civil law. Goirand's French Code of Commerce, arts. 305, 306, says:

"The captain cannot, as security for the freight, detain the goods in his ship; but he can require that the goods be deposited in the hands of a third party, by legal authority, until complete payment."

This is limited by its letter to freight, but the same principle necessarily applies to the amounts due for general average. We use the citation broadly, because the author relies for his support on a decision of the court of cassation, and not on the local code.

Therefore the owners of the schooner were bound to discharge the cargo, even into the lighters of its owners, before they could enforce actual payment of either freight or general average. The law is anxious to protect and enforce the right of the owner of a vessel to his freight, and also that to the reimbursement of general average charges and other charges; but it has never subordinated to such matters the duty of the vessel to transport and discharge its cargo. No view of the law, as applicable to this case, excused the owners of the schooner from making prompt discharge of the cargo, if insisted

on by its owners. Therefore it is apparent that, under the ordinary rules of law, the owner of a vessel cannot detain the cargo aboard for nonpayment of freight, and by parity of reasoning for nonpayment of general average, and thereupon charge demurrage arising from such detention. It is true that, under some peculiar circumstances, it would be absurd to hold that the master was bound to discharge instanter, and therefore quasi demurrage for a reasonable time might be allowable under such circumstances. Such allowances, however, would not be strictly in consequence of the detention of the cargo aboard the vessel in order to secure a lien, but would arise, according to the flexible methods of the maritime law, out of the special and peculiar circumstances. In the case at bar, however, lighters and other facilities for discharging the cargo were promptly at hand, and the retention of the cargo aboard the vessel was strictly on account of the question which arose about the average bond and to enable the master to retain a common law lien; and so it afforded, for the reasons and according to the authorities we have cited, no basis for damages in the way of demurrage.

But a complete disposition of the case requires us to come somewhat nearer to the facts. We have already observed that, in the theory of the law, either party had the right to exact a cash settlement of the general average, and neither was holden, on the one side to give security, or on the other to accept it. Nevertheless, the almost universal practice is for the master, before delivering the goods, to take an average bond, and for the owners of the cargo to give such a bond. It is not necessary to enlarge on this. The reasons for it, if any one deems them necessary to be stated, can be found in Kay, Shipm. (2d Ed.) 201; Lown. Gen. Av. (4th Ed.) 336, 337; Huth v. Lamport (already cited) 16 Q. B. Div. 735, 736; and Svendsen v. Wallace (already cited) 10 App. Cas. 404, 410. Indeed, the theoretical remedy of a cash settlement is so impracticable that Lowndes states, in substance, that something else is imperative. He says, indeed, that some other reasonable arrangement therefor "has to be come to." The conditions are so urgent, and the practice of giving and accepting security is so universal, that an admiralty court would look with disfavor, so far as in its power to do so, on any owner, either of a vessel or cargo, who refused to conform to it. In the present case neither party assumed so unreasonable a position, but each was willing to give and take an average agreement; and the whole difficulty arose as to its details of form, if not of substance. The general condition of the controversy was correctly stated by the appellants, to the effect that the consignees refused to sign a bond in the form in which it was presented to them, but expressed a willingness to sign one provided certain clauses were stricken out and additional words placed therein. The bond thus presented, with the words to which they objected and those which they desired added, are shown in the following copy of so much as we deem necessary to insert for this purpose:

"Whereas, it being represented that the schooner Nellie J. Crocker whereof F. B. Sursall is or lately was master, having on board a cargo of green cypress, in which we are interested as owners, shippers or consignees, sailed

from Appalachicola, Fla., on or about the thirtieth day of September, 1894, bound for Lynn, and in the course of her said voyage *upon the 7th, 8th, 9th of October* encountered a hurricane, during which the said schooner suffered *serious* damage, and it became necessary for the interests of all concerned to put into the port of Savannah as a port of refuge, *from which port, to save expense of discharging and repairs at Savannah, said schooner was towed after temporary repairs to Lynn, her port of destination,* and that thereby certain losses and expenses were incurred, and other and further losses and expenses consequent thereon may · yet be incurred, and that such losses and expenses may be a charge, by way of general average or otherwise, upon the vessel, her freight and cargo, or either of them: Now, therefore, we, the subscribers, owners, shippers, or consignees of such of the cargo of said vessel as we have severally described and set opposite our respective signatures hereto, in consideration of the premises and of the delivery to us respectively of such cargo, or so much thereof as may be saved, without retention pending an adjustment of said losses and expenses, do hereby, for ourselves, our respective executors and administrators, severally and respectively, but not jointly, nor the one for the other, covenant and agree to and with Morse & Co., owners, or agents of the owners, of the said vessel, and with one another, that the losses and expenses aforesaid, or so much thereof, as, upon an adjustment of the same to be stated by Theodore W. Gore, according to the laws and usages of this port in similar cases, may be shown to be a charge upon the said cargo, or upon any of the cargo of said vessel which may be received by us, shall be paid by us, respectively, according to our several and respective parts or shares thereof, unto the said Morse & Co. when such adjustment is completed and due notice given thereof (as made in accord with agreement of parties or a decree of court of competent jurisdiction).

In the foregoing copy the words to which the consignees objected appear printed in italics, and those which they desired added appear in the parenthesis at the close of the paper. No objections were made to the instrument except as stated. As finally executed by agreement between the parties, the words objected to were stricken out, while those the consignees desired added do not appear.

The general rules of law applicable to the parties under these circumstances is well explained in Huth v. Lamport (already cited) 16 Q. B. Div. 442, 735. The principles which underlie that case are so clear, and the case itself is in all respects so entirely in harmony with the reason and necessities of the law, that we do not deem it important to refer to it as an authority, or to search for other decisions to support it. We use it as a convenient method of expressing the rules which undoubtedly govern the case at bar. The most convenient exposition of Huth v. Lamport, which originated in the queen's bench division and was affirmed in the court of appeal, is found in Lown. Gen. Av. (4th Ed.) at page 336 et seq.; and, beyond referring to this exposition, we will only state its substance briefly. First, it was held that, inasmuch as the parties had waived their strict rights with reference to immediate payment, and each party had impliedly consented to conform to the usage by virtue of which an average bond was to be given and taken, the owner of the vessel was, in the eyes of the law, liable for refusing an average bond in a reasonable form, and insisting that it should contain unreasonable conditions. The court also refused to justify the form of bond demanded, although it had been sanctioned by an extensive usage for a considerable number of years. The court further pointed out wherein the bond required was unreasonable; but we need not dwell on this, except to

observe that the court approved the old London form, which was conditioned in the simplest terms to pay the obligor's share of general average when called upon, and that the result of the case shows that anything which in substance demands more than this, or which would in any way prejudice the owner of the cargo in denying the entire liability, or in questioning the amount of it if the liability was established, or which would close any of the methods which the law gives for ascertaining and determining the existence or extent of liability, cannot receive the approval of the courts. On the other hand, it is evident, reciprocally, that the master, on surrendering his lien, is entitled to demand security of an effectual character, and of such nature as will leave open, in his behalf, all legal methods of determining any controversy which may arise, and of promptly enforcing whatever amount the result of such determination may show he is entitled to. While, on the one hand, he cannot foreclose any questions which the owner of the cargo is entitled to have determined, he, on the other, is not required to weaken his position substantially, or to surrender any methods of relief, or to delay it, except so far as the same may be unavoidable in view of the fact that he gives up his lien.

Applying these propositions to the positions of the parties in this case, the legal effect of them is clear. The insistence in the bond offered by the owners of the schooner on an adjustment by Mr. Theodore W. Gore might have been held unreasonable, if objected to; but it was not, and therefore it must be held to have been waived. The recitals which it contained were practically the same as found in the approved agreement set out in Svendsen v. Wallace (already cited) at page 410, and it was free from the cumbersome and somewhat questionable features found in the old forms, of which examples are contained in some of the early text-books. It is true that the grammatical connection leaves a possible doubt with reference to the point made by the cargo owners, that the portions which they desired stricken out contained an implied admission of a liability for general average on account of the towage bill; but that portion was in the end stricken out, and nothing in the case shows that any hesitancy would have arisen about it if the cargo owners had limited their objections to it. On the other hand, the addition proposed by the cargo owners postponed any suit against the sureties on the bond until the end of litigation with the consignees, in the event the general average was not adjusted by mutual agreement. This was fatal to the position occupied by the consignees at the time of the controversy. So far from its being subsequently obviated by them, their letter in the record to which we are referred by them, dated November 19th, three days after the vessel reported herself ready to discharge her cargo, and three or four days before the parties finally agreed on the form of a bond, insisted on the same objectionable feature. It nowhere appears that the consignees modified their position in this particular until the day the matter was finally adjusted.

In view of these considerations, while we are of the opinion that the owners of the schooner are not entitled to demurrage, or quasi demurrage, pending the detention of the vessel with the cargo aboard,

we are also clear that the consignees were at fault for not promptly tendering a suitable general average agreement, free from all objectionable provisions. Under these circumstances, it is apparent that the controversies before us would not have been here if either party had proceeded reasonably in accordance with maritime law and usages, and that neither party is entitled in the matter to the favor of a court of admiralty.

The decree of the district court is reversed, and the case remanded to that court, with directions to dismiss the libel, without costs for either party, either in this court or in that.