THE CARGO OF THE JOSEPH W. BROOKS.

(District Court, E. D. North Carolina. May 22, 1903.)

1. SHIPPING—CONSTRUCTION OF CHARTER PARTY—DISPATCH FOR DISCHARGING.
A provision of a charter party for "dispatch for discharging" is to be construed with reference to the custom of the port where the discharge is made, which is fixed in large measure by the facilities at such port for discharging the kind of cargo carried.

2. ADMIRALTY—PLEADING.
A claim in a libel for demurrage should be specific, stating the number of days and the dates for which the demurrage is claimed.

3. SHIPPING—CLAIM FOR DEMURRAGE—DELAY AWAITING PAYMENT OF FREIGHT.
An agreement between a master and a charterer that the latter shall mail a check to the master for the freight earned at once on being advised that the discharge of cargo has been completed to another port to which the vessel was to proceed is a waiver of strict performance of a provision of the charter party making the freight due at once on discharge, and where the check was so mailed on the day the discharge was completed, and was received and collected by the master, he cannot claim demurrage for the time between the discharge and payment, nor can he maintain a libel against the cargo for the freight, filed in the meantime.

4. SAME—DELAY IN DISCHARGING.
Evidence held not to establish a claim for demurrage against a charterer on the ground that dispatch was not made in discharging, as required by the charter.

In Admiralty.

Thos. Evans, for libelant.
J. D. Bellamy, for claimant.

PURNELL, District Judge. Libelant, on August 25, 1902, filed his libel against the cargo landed in port at Wilmington on the forenoon of August 23, 1902. The charter party referred to in the libel and introduced in evidence, marked "A," provided for a cargo under deck of guano in bulk of at least 1,000 tons of 2,240 pounds, and to pay for the use of the vessel during the voyage $1 per ton, charterers to load and trim cargo aboard of vessel free of any cost to her, and lay days for loading and discharging to be as follows: Commencing

¶ 3. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

122 F.—56

with the time the captain reports he is ready to receive ·or discharge cargo, 150 tons per day for loading, Sundays and legal holidays excepted. Dispatch for discharging, and for each and every day's detention by default of such party of the second part (the Armour Fertilizer Works or agent) $72.90 per day shall be paid the party of the first part, and the further customary stipulations. The discharge of the cargo was completed on the 23d of August, 1902, and libelant claims seven days was ample time for discharging cargo, but, by the default of the Armour Fertilizer Works not receiving the same with dispatch, 8½ days was consumed in the completion and discharge of the cargo of August 23d, 1902, at noon. Libelant demanded of the agent of the Armour Fertilizer Works payment of freight and demurrage, and the failure to so pay caused libelant's delay, as it became his duty to lie by the cargo, as by removing the ship he would thereby impair his lien on the same. Libelant demands $1,000 as the freight, and $72.90 for each day the ship is or may be detained by default of the shipper, consignor, consignee, or their agent.

Respondent admits the charter party; with the explanation that the cargo was to be long tons of 2,240 pounds each, and that the delivery was to be made at Wilmington at the rate of 150 tons per day at 2,000 pounds, short tons, and further denies the libelant began to discharge the cargo on Thursday morning as alleged, but avers the discharge began on the afternoon of that day. Libelant was requested to begin the discharge in the morning, and that for four days thereafter the claimant requested of the libelant to give him the cargo faster than it was being delivered, and libelant failed to do so. Avers that only eight days was consumed in discharging the cargo, and that the same could have been discharged in four days if libelant had delivered it as rapidly as claimant was ready and willing to receive it. It is admitted that the libelant demanded of the agent of the claimant the freight, but denied that there was any claim for demurrage, and that at the time such demand was made the agent of the claimant telegraphed the Armour Fertilizer Works, and it mailed a check for the same to Savannah, Ga., and telegraphed its agent at Wilmington that it would mail the check to the captain at any place he might designate, pay the agent of schooner in Baltimore, or captain could draw on claimant at sight, and this telegram was received at Wilmington and shown to libelant before these proceedings· were instituted. Denies it was necessary for libelant to lie by the cargo to preserve his lien thereon, as libelant knew the freight was collectible, claimant being worth many millions of dollars.

The pertinent facts are found from documentary ·evidence filed or admitted to be as follows: The vessel arrived at Wilmington on the 13th day of August, and commenced to discharge cargo on the 14th day of August (Exhibit A, letter of N. A. Davidson, captain, in which he revokes order to pay freight to S. Marts & Co. at Baltimore; and requests freight be paid him). There is a dispute as to whether vessel commenced discharging cargo in the morning or in the afternoon (a difference of half a day, and the cause of the delay). On August 19th, in reply to the letter (Exhibit A), claimant wrote Capt. David-

son as soon as a wire from J. C. Everitt, its agent, was received, stating the cargo was unloaded, a check would be forwarded in payment of freight. To this Davidson, on the 21st, replied (Exhibit C): "Accept thanks [for proposition to mail check; see Exhibit B.] Mr. J. C. Everitt has done all he could towards making time on discharge of cargo. Pray don't think Messrs. Marts & Co. had anything to do about demurrage in Baltimore. Let it all rest on me," etc. The discharge was completed at noon on August 23d. On August 25th the libel was filed, and the ship sailed for Savannah, Ga. The 24th of August was Sunday. August 23d a certified voucher check was sent to Savannah, Ga., payable to Capt. N. A. Davidson for $1,000, amount of freight, indorsed by him, and paid.

The foregoing record evidence being submitted, proctors were requested to procure a stenographer to take down the parol testimony, when it was by mutual consent agreed (the judge, calling attention to the rule in this circuit on the subject as laid down by the Circuit Court of Appeals, saying he would not undertake to write down the testimony) this was unnecessary, the rule was waived, and the judge requested to take down only so much of the testimony as he deemed proper. The following testimony was offered and taken down:

Roadstram, agent of the Armour Fertilizer Works, proves bill of lading, charter party, letters from Capt. Davidson. Libel of cargo was on 25th of August. Asked what is the custom of the port of Wilmington as to unloading cargo. (Objection by libelant. Objection overruled. Exception. Exception allowed.) Answer. The custom of the port of Wilmington for unloading vessels, cargo in bulk, has been for many years 50 tons per day. This has recently been increased to 100 tons per day. This is a rule established by the chamber of commerce of Wilmington.

Joseph Kyle: Am secretary of the chamber of commerce, Wilmington. Asked as to what is the custom of the port as to discharging cargo. (Objected to by libelant's proctor. Objection overruled. Exception. Exception allowed.) Answer. Fifty tons per day, cargo in bulk fifty tons per day. This has been the custom according to record for a great many years. The rules of the chamber of commerce govern the members thereof. Capt. Davidson is not a member of the chamber of commerce.

Thos. D. Meares: Have been connected with the business of the port of Wilmington, N. C., for thirty years. Libelant interposes same objection. The custom of port for cargo in bulk has been for many years fifty tons per day. Four years ago this custom was changed to one hundred tons per day on account of the improved facilities for discharging cargo. Have unloaded a great many ships. Would consider one hundred tons per day dispatch in discharging cargo in bulk at this port.

J. C. Everitt, agent Armour Fertilizer Works, at Wilmington: Received the cargo of the Joseph W. Brooks. The ship arrived in port Wednesday night (August 13th). Got ready to receive cargo Thursday. Protested every day against the captain not giving more tons per day. Could have unloaded the vessel in six days.

Capt. Williams: Am captain of the steam tug Morion, serving as stevedore. Discharged cargo of the Joseph W. Brooks. Commenced at 1 o'clock, Thursday, August 14th. Could not commence sooner on account of scaffold on wharf. The gang was there ready to receive the cargo. When we commenced we used barrels holding three hundred pounds. After I made complaint that the cargo was given to me too slow, from only one hatch, it was given from both hatches. Made good dispatch in unloading vessel, two hundred to two hundred and twenty-five tons per day. Had some trouble about run of cargo. (Same question and objection as to custom of port before noted.) Cannot say fifty tons was custom of port.

The contention of claimant that discharge was to be by short tons of 2,000 pounds cannot be sustained. There is no evidence to this effect. The only ton referred to in the charter party is defined to be "a cargo of one thousand tons of 2,240 pounds," hence this is the ton referred to throughout the record. But this seems to be immaterial. The only provision in the charter party as to discharge of cargo is as follows: "It is agreed that the lay days for loading and discharging shall be as follows," commencing with the time the captain reports himself ready to receive or discharge cargo (150 tons for loading, Sundays and legal holidays excepted); "dispatch for discharging;" "and for each and every day's detention by default of the party of the second part or agent, $72.90 per day shall be paid day by day by said party of the second part or agent to said party of the first part or agent."

It appears from the record the freight has been paid, although libelant's proctor claims it has not; that a check is not payment. Libelant seems to have gotten the $1,000 at all events, and receipted for the same, and claimant produces the voucher check, with receipt in full for the freight, both indorsed and signed by Capt. Davidson, which bears evidence of having passed through several banks, been paid at the bank on which it was drawn, duly charged up, and returned with the indorsements to the Armour Fertilizer Works, by which it was drawn. According to modern business methods, this is evidence of payment and satisfaction.

The words of the charter party, "dispatch for discharging," are indefinite and uncertain. To explain them, the custom of the report where modern elevators and improved steam or electric machinery is used for discharging cargo would mean many more tons per day than in a port where the facilities are not so good. The parties probably knew the difference in facilities at Baltimore, where the vessel was being loaded, for which 150 tons per day was specified, and Wilmington, where for discharging the indefinite expression was used, leaving this to be construed according to the custom of the port. Proctors do not cite authority for their contention, but the view of the court is amply sustained by the decisions in The Eddy, 5 Wall. 481, 18 L. Ed. 486; The Bird of Paradise, 5 Wall. 555, 18 L. Ed. 662; The Delaware, 14 Wall. 596–601, 20 L. Ed. 779; Wellman v. Morse, 22 C. C. A. 318, 76 Fed. 577. The custom of the port means simply the practice, usage based on the facilities for unloading vessels, which is better known by parties engaged in the business, and have been so engaged for years, than by any one else. Such were the witnesses introduced, and the fact proved that a cargo of 1,000 tons was discharged in eight days, 125 tons per day, or 25 tons above the average of the custom of the port in unloading a cargo in bulk.

The libel does not make a specific claim for demurrage, except of $72.90 per day, without specifying what days, or even how many. This is bad pleading. The claim should be specific; not leave the claim open, and the proctors or the court at sea as to what libelant thinks he is entitled to. The court might dismiss the libel for indefiniteness, or order a redraft thereof in this respect. But, consider-

ing the case as presented, what demurrage was there by default of the party of the second part or agent? The unloading, according to the terms of the charter party, was to commence from the time the captain reports himself ready to discharge cargo. There is no evidence of when the captain so reported himself so ready, but, according to his letter of the 21st (Exhibit C), the captain wrote the Armour Fertilizer Works its agent had done all he could towards making time on discharge of cargo, and taking upon himself responsibility for demurrage in loading at Baltimore. "Let all rest on me," he says. Up to this date, seven days after he had commenced to discharge cargo, there was no complaint on his part that there was not dispatch in discharging. There is evidence that there was complaint the cargo was not given to the stevedore fast enough, and, after protest on this account by Everitt and Williams, it was given from both hatches, and was discharged at the rate of 150, 200, and 225 tons per day. There is absolutely no evidence as to any default on the part of the consignee or its agent up to the time the discharge was completed on the 23d at noon. Was there any default after this? The libelant demanded his freight immediately, and on this day the check was mailed to him at Savannah, Ga. He received the check at Savannah, indorsed the same, and received the amount of the freight, $1,000. It was not necessary for the vessel to lie by the cargo which had been delivered, and the vessel sailed on the following Monday. Sunday is dies non, but still the Brooks might have sailed. Banks are usually open for business until 3 o'clock p. m., which, if this vessel was in such haste to get to sea, allowed three hours to draw at sight, wire, or otherwise arrange affairs and put to sea. If entitled to any demurrage, it would only be for half of Saturday, Sunday, and half of Monday.

A careful examination of the charter party discloses the fact that the ship broker, to whom this captain revoked order to pay freight, and manifested anxiety to excuse for demurrage in Baltimore, is to receive 5 per cent. of the freight and demurrage, while Capt. Davidson appears only in the libel, and to have dropped out after receiving his freight at Savannah. This furnishes an insight into the libel not disclosed in the argument. The cargo had been delivered. No freight was due until it had been delivered. Libel could have been filed if there was doubt about the payment of the freight on Saturday. Why, then, wait until Monday? All parties agreed to the proposition to mail check (Exhibits A, B, C) as soon as notified cargo was discharged. This was done, and constitutes a waiver of any provision of the charter party as to payment of freight.

It is therefore considered, ordered, and decreed that the libel herein be, and the same is, hereby dismissed. It is further ordered and decreed that libelant and the sureties on his stipulation pay the cost of this libel, to be taxed by the clerk of this court.

It is so ordered.