JEBSEN v. A CARGO OF HEMP.

(District Court, D. Massachusetts. June 9, 1915.)

No. 995.

1. SHIPPING ⬤⟾154—CARRIAGE OF GOODS—LIEN FOR FREIGHT.
    A ship has a lien for freight on the cargo rightfully aboard, whether or not she is under charter, and without regard to whether the owner or a charterer is entitled to the benefit of the lien.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520; Dec. Dig. ⬤⟾154.]

2. SHIPPING ⬤⟾49—TIME CHARTER—RESERVATION OF LIEN ON CARGOES.
    Libelant, as owner, let a steamship by a time charter, which was not a demise of the vessel, but required libelant to man, victual and

navigate her and keep her in effective condition and repair. The charter provided that the hire should be paid monthly in advance, gave the charterer the option to sublet, and authorized the charterer or subcharterer to load with such cargo, at such rates of freight, and for such ports, within specified limits, as he saw fit, and to require the captain to sign bills of lading therefor. It further provided that "the owner shall have a lien on all cargoes for freight or charter money due under this charter." The charterer sublet by a similar time charter in which it was named as "time charterer." The subcharterer paid the charterer, but the latter did not pay the owner, who thereupon libeled a cargo being carried for hire by the subcharterer. *Held*, that the charter left libelant in possession during the charter term, with the right to the benefit of the ship's lien on all cargoes carried, whether or not the charterer had any interest therein; that, as against the subcharterer, which took subject to such right, the lien was enforceable, although the subcharterer had paid in full under its own charter; but that, as against the owners of the cargo, the lien was enforceable only to the extent of unpaid freight.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. ☞49.]

3. SHIPPING ☞49—TIME CHARTER—SUBCHARTER—OWNER'S LIEN FOR CHARTER HIRE—"ALL CARGOES."

A time charter of a ship containing a provision giving the owner a lien on "all cargoes" for charter hire, with a further provision giving the charterer the right to sublet, has the effect of giving the owner the benefit of the ship's maritime lien for freight on all cargoes, whether carried by the charterer or a subcharterer, although such right might otherwise be deemed to have been waived by other provisions, such as one requiring payment of the charter hire at stated times in advance.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. ☞49.]

4. SHIPPING ☞49—TIME CHARTER—SUBCHARTER—OWNER'S LIEN FOR CHARTER HIRE.

Where such charter, however, authorizes the charterer or subcharterer to load the ship with such cargoes at such rates of freight as may be agreed upon with shippers, and to require the captain to sign bills of lading therefor, the owner's lien is limited to the amount of freight so agreed upon and which remains unpaid by the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. ☞49.]

In Admiralty. Suit by Wilhelm Jebsen against a cargo of hemp ex steamship Symra and the freight thereon; the Munson Steamship Line, claimant. Decree for libelant.

Convers & Kirlin, of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (John M. Woolsey, of New York City, of counsel), for libelant.

Haight, Sandford & Smith, of New York City (John W. Griffin, of New York City, of counsel), for claimant.

MORTON, District Judge. This is a libel by the owner of the steamship Symra against the cargo and freight, to recover the balance alleged to be due for the hire of the steamer under a charter to the Canadian-Venezuelan Ore Company. I shall speak of that company as the Ore Company, and of the charter to it as the charter.

The charter was on what is known as the government form, and was "for the time of about thirty-six calendar months from the day of her

[the steamship's] delivery" to the charterers. The charterers were to have the disposal of "the whole reach of the vessel's holds, decks, and usual places of loading and passenger accommodations of the ship, * * * reserving only proper and sufficient space for the ship's officers, crew, tackle, apparel, furniture, provisions, and stores." The libelant was to man, victual, and navigate the vessel, and keep "her in a thoroughly efficient state in hull and machinery for the service." The charterers were "to pay for the use and hire of said vessel at the rate of ten hundred and fifty pounds (£1,050) sterling per calendar month," "payment to be made in cash monthly in advance at New York."

It was further provided that "the owner shall have a lien upon all cargoes for freight or charter money due under the charter." The charterers were "to have the option of subletting the steamer." The captain was to be under the orders and directions of the Ore Company "as regards employment, agency, or other arrangements," and was to sign bills of lading at rates of freight as directed by the Ore Company; and the Ore Company was to "indemnify the owner for all consequences or liabilities that may arise from the captain so doing." The charter also contained numerous other provisions.

The Ore Company sublet the steamer to the Munson Line, the claimant, under a charter similar to that from the libelant to the Ore Company. In the charter to the Munson Line, the Ore Company were described as "time charterers" of the steamship. The Munson Line loaded the vessel at Progresso, Mexico, for Plymouth, Mass., with a cargo of hemp consigned to Henry W. Peabody & Co. The rate of freight was agreed upon between the Munson Line and Peabody & Co. The bill of lading was on a Munson Line form, and was signed by the captain as master. The freight was payable on delivery.

Before loading with the hemp at Progresso, the vessel had been at or near Havana, Cuba, with a cargo of coal shipped under a Munson Line bill of lading, on which the freight was also payable on delivery. There was at that time a balance due to the libelant for the hire of the steamer, and counsel for the libelant threatened to enforce by proceedings at Havana the lien for such balance which he claimed the libelant had under the charter on the cargo of coal and freight. Thereupon counsel for the Munson Line gave an undertaking which was satisfactory to counsel for the libelant, and the steamer was allowed to proceed on her voyage. Subsequently a stipulation was entered into between the parties, the object of which was and is to put the parties, without prejudice to the rights of either, in the same position as they would have been in, if the cargo here in question had been in the vessel's hold with the freight unpaid at the time of the filing of the libel, and both had been duly attached.

The Munson Line has accounted for and paid over to the Ore Company, directly and through garnishee proceedings in New York instituted by the libelant, all that was due from it to that company for the hire of the steamer under the subcharter from the Ore Company to it. It does not appear, if material, whether these payments were before or after notice was given by the libelant of his intention to enforce his alleged lien; and no question has been raised as to the effect

one way or the other of such payments. The Ore Company having defaulted in its payments to the owner, he seeks by these proceedings to recover the balance due from it to him, out of the freight money agreed to be paid by Peabody & Co. to the Munson Line. In effect he contends that he is entitled to have his loss, from the charterer's failure to pay, made good at the expense of the subcharterer; in other words, that under the terms of the charter and subcharter his right to the freight money in question is superior to that of the Munson Line.

[1] A ship has a lien on the cargo rightfully on board for the freight or carriage. This is the general rule. It is not necessary now to inquire into the origin of it. See Wellman v. Morse, 76 Fed. 573, 22 C. C. A. 318. It is ancient and well-settled law in admiralty, and is so treated by the parties. So far as the lien itself is concerned, the fact that the ship is under a charter is immaterial. As to the person, who is or may be entitled to the benefit of the lien, whether the owner or the subcharterer, there may be a question.

[2] Whether the charterer should be regarded in the present case as the owner pro hac vice depends on the terms of the charter party. It is plain, I think, that the charter party did not constitute a demise of the ship, and that, therefore, neither the charterer nor the subcharterer can be regarded as the owner for the time being. The Volunteer, 1 Summ. 551 [Fed. Cas. No. 16,991]; Reed v. United States, 11 Wall. 591, 20 L. Ed. 220; United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; Clyde Commercial S. S. Co. v. West India S. S. Co., 169 Fed. 275, 94 C. C. A. 551; Dunlop S. S. Co. v. Tweedie Trading Co., 178 Fed. 673, 102 C. C. A. 173; The Volund, 181 Fed. 643, 666, 104 C. C. A. 373. The claimant has not, indeed, contended that it did, though if that were the case it would seem to furnish a short and easy answer to the libelant's demands. What was let was the cargo and passenger carrying capacity of the vessel, not the vessel itself. That remained in the possession of the libelant, and was victualed, manned, navigated, and managed by him. The captain was subject to "the orders and directions of the charterers as regard employment, agency, or other arrangements," but not otherwise. This provision was explained by Mr. Robinson, manager of the operating department of the Munson Line, as meaning, so far as the trade understanding of the word "employment" was concerned, the trade in which the steamer shall be employed, the ports to which she shall go, and the cargo she shall carry, and, so far as the word "agency" was concerned, the agents to whom she should be consigned at the ports to which she traded. No definition was given of the words "other arrangements"; but their significance must correspond with the connection in which they are used.

This gave the charterers, as the charter was no doubt intended to do, such control of the ship as was necessary for the passenger and freighting business for which they chartered her, but left the ship itself in the possession and management of the libelant, with the result that he thereby had such possession of the cargo as if possession is one of the things necessary to a lien on the cargo—as it undoubtedly is—was

sufficient for that purpose. Mere possession, however, is not enough, of itself, to establish a lien. The party claiming one is bound to show that he is entitled to it under the rules prevailing in admiralty.

[3] The question then is: Has the libelant shown that he is entitled to a lien on the cargo for the balance of the charter money which is alleged to be due? And the answer to this question depends also, it seems to me, on the terms of the charter party. It was a time charter party, and contained provisions as to the time and place of payment of the charter money, which were inconsistent with, and would operate as a constructive waiver of, a lien (Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47), unless prevented from so doing by the provision that "the owner shall have a lien on all cargoes for freight or charter money due under this charter." The claimant contends that the lien thus provided for is limited to cargoes shipped by the charterer. But the language is "all cargoes"; and the provision as to subletting shows that it was within the contemplation of the parties that other cargoes than those belonging to the charterer might be carried. It needs no argument to show that the construction of the clause cannot be affected by the expectation of the parties that the vessel would in fact be used to transport ore and coal for the Ore Company. As Mr. Richards, the manager of the ship brokerage department of Bowring & Co., testified, the Ore Company had the right to use the vessel in any other trade.

Not only is there nothing in the charter limiting in terms the cargoes on which a lien was reserved to those shipped by the charterer, but I think that such a construction would not be warranted as matter of law. It is said, in American Steel Barge Co. v. Chesapeake & O. Coal Co., 115 Fed. 669, 53 C. C. A. 301, of the clause similar to this:

"Neither the origin nor the history of the clause * * * can be clearly traced. * * * That, however, it was not framed simply with reference to furnishing a lien on a cargo belonging to a charterer, seems to follow from Paul v. Birch, 2 Atk. 621, where, as early as 1743, it was held sufficient to bind to the owner of the ship a cargo in which the charterer had no interest."

And in Portland Flouring Mills v. Portland Steamship Co. (D. C.) 145 Fed. 687, it was held that the lien referred to in a similar clause in a bill of lading was the maritime lien as understood in the jurisprudence of the United States, and that the effect of it was or might be to preserve the lien where it might otherwise be deemed to be waived by other provisions relating to the time and manner of paying the freight. Whatever, therefore, may be the true ground on which the provision rests, it is clear, it seems to me, that in the present case it gives to the libelant the benefit of the lien which the ship has for its carriage on the cargo as security for the payment of the charter money.

[4] But it does not follow that the libelant is entitled to enforce the lien to the full extent of the balance due for charter money, regardless of the amount agreed upon for freight between the Munson Line and Peabody & Co. and still unpaid. The charter authorizes the charterer or subcharterer, as the case may be, to load the vessel with such cargo, at such rates of freight, for such ports within the specified limits, as he sees fit or may be able to do, and to require the captain to sign

bills of lading therefor, with the result that the libelant can enforce his lien only to the extent of the freight agreed upon between the charterer or subcharterer and the shipper; and if the freight has been paid in whole or in part in good faith by the shipper to the charterer or subcharterer without actual notice on the part of the shipper of the claim of the libelant, then the lien can be enforced only to the extent to which, if at all, the freight remains unpaid. American Steel Barge Co. v. Chesapeake & O. Coal Agency, supra, 115 Fed. 672, 53 C. C. A. 301, and cases cited. In the present case no part of the freight had been paid, and the owner, having possession through the captain of the ship and the cargo, could direct the captain to refuse to deliver the cargo, except upon payment of the freight money to him, and upon receiving the money to apply it pro tanto to the payment of so much of the charter money as was due or unpaid, accounting for and paying over any balance to the Munson Line; or the owner could bring a libel in rem (as he has done) against the cargo and freight. It is true, as the Munson Line strongly contends, that the contract for the carriage of the goods was made by it with the shipper, and that in signing the bill of lading the captain acted as its agent, and that the freight belongs to it and is payable to it. It is true, also, that if the Ore Company were solvent and had paid the charter money as it fell due, and the shipper had for any reason failed or neglected to pay or secure the payment of the freight or tender on delivery of the cargo, the Munson Line would have been entitled to the benefit of the lien for the purpose of enforcing, as Mr. Robinson testified it would have done, the payment of the freight. But, as already observed, the Munson Line must be deemed to have taken with notice of and subject to the reservation of the lien on the cargo for the charter money due to the owner, the libelant; and the insolvency of the Ore Company, far from divesting the libelant of the lien and entitling the Munson Line by subrogation or otherwise to the benefit of it, furnishes occasion for resort by the libelant to the security afforded by the lien which he expressly reserved, and which it is not contended that he has ever done anything to waive.

The fact that the claimant has paid the Ore Company what was due from it to that company does not create an equity in its favor. The Ore Company was described in the subcharter as a "time charterer." In addition, Mr. Robinson, previously referred to, testified that he knew that the Ore Company had a time charter of the vessel and was not the owner. The Munson Line was bound, as a matter of prudent business conduct, to examine the charter of the Ore Company, and to govern itself by the provision therein reserving to the owner a lien on "all cargoes" for the charter money. See Gracie v. Palmer, 8 Wheat. 616, 5 L. Ed. 696. The payment by the Munson Line to the Ore Company must, I think, be deemed to have been made at its risk.

It follows that the libelant is entitled to maintain and enforce the lien on the cargo for the purpose of enabling him to recover the charter money due from the Ore Company. See The Albert Dumois (D. C.) 54 Fed. 529; Wehner v. Dene Steam Shipping Company, Ltd., [1905] 2 K. B. 92. As incidental to that, he has a right to pursue the freight,

not because he has a lien upon it, but because it represents the sum to be paid for the use of the ship in the carriage of the cargo, for which he has a lien on the cargo. He is entitled to be compensated, either by the payment of the charter money, which represents the use of the ship, or, failing that, by resort to the sum agreed to be paid by the shippers as freight.

The remaining question relates to the amount which the libelant is entitled to recover. It is in substance agreed that that is $1,635.62, with interest and costs, unless that amount should be proportionately reduced by the withdrawal of the vessel by the libelant from the charter to the Ore Company on February 2, 1914, at 3 p. m., as alleged by the claimant, instead of on February 5th, as alleged by the libelant. The charter provided that, on default of the Ore Company in the payment of the charter money when due, the libelant could withdraw the vessel from its service. There was a monthly payment due from the Ore Company to the libelant on January 5, 1914, for the month ending February 5th, which was not paid when due. It is the balance of this payment which the plaintiff seeks to recover.

According to the deposition of Capt. Handeland, the master of the ship, she arrived at Plymouth on January 28, 1914, with a cargo of hemp from Progresso, and commenced to discharge at 11 o'clock a. m., and finished discharging at 5 p. m. on the 29th, the next day, when the ship was redelivered by the Munson Line, the charterers of that voyage, to the Ore Company. The vessel sailed from Plymouth for New York February 2d at three p. m., and it is a fair inference from the deposition of Capt. Handeland that he sailed pursuant to orders which he had from his owners to proceed to New York for orders. On February 4th a formal notice of withdrawal from the charter for nonpayment of the last monthly installment was served on the Ore Company by Bowring & Co. of New York, acting for the owner. This recited that:

The "steamer is now at Plymouth, having completed the discharge of her outward cargo there, and thus ended her charter with the Munson Steamship Company, and, as it becomes necessary to arrange further employment, and inasmuch as you have not paid the last installment of hire due, and have advised us that you cannot continue the vessel under your charter and continue to pay hire for her, the owners notify us to inform you that they accordingly withdraw the boat immediately from the charter with you. * * *"

Mr. Richards, referred to above, testified that the vessel was withdrawn February 5th. The recital in the notice that the "steamer is now at Plymouth," on which the notice was based, was manifestly an error. Although the notice was not given until after the steamer had left Plymouth, it is plain, I think, that the intention was to withdraw the steamer from the charter when she had finished discharging her cargo at Plymouth, and had thus terminated her charter from the Ore Company to the Munson Line. When the captain sailed from Plymouth to New York on February 2d, pursuant to orders from his owners, as he deposed, the vessel was in fact withdrawn from the service of the Ore Company. It follows that the sum claimed should be proportionately reduced.

Decree accordingly.