## THE SOLHAUG.

### AKTIESELSKAB VENBORG v. CERTAIN FREIGHTS AND SUBFREIGHTS, etc.

District Court, S. D. New York.
Feb. 14, 1931.

Haight, Smith, Griffin & Deming, of New York City (Herbert M. Statt and Edgar R. Kraetzer, both of New York City, of counsel), for libelants.

Henry F. Cochrane, of New York City, for National Sugar Refining Co.

To the Honorable the Judges of the United States Distrit Court for the Southern District of New York:

I, RALPH W. BROWN, Special Commissioner, do hereby report as follows:

This is a suit by Aktieselskab Venborg, owner of the Norwegian steamship Solhaug, and Ludorf Larssen, her master, to recover balance of unpaid charter hire due the owner under a certain time charter entered into at New York by and between the said owner, a Norwegian corporation, and Columbus Line, Inc., a Delaware corporation having an office and place of business at 15 Moore street, New York City. The suit, which is in rem against certain freights and subfreights due at New York in connection with the carriage of a certain cargo of sugar, was commenced on or about April 2, 1930, by service of process upon Columbus Line, Inc., and upon National Sugar Refining Company of New Jersey, owner of the Solhaug's cargo and a holder in due course of negotiable bills of lading issued therefor, and seeks to enforce a lien in favor of the owner, which the libelants claim was provided in the aforesaid time charter.

Thereafter and on or about April 25, 1930, as no claim was entered either by Columbus Line, Inc., or by National Sugar Refining Company of New Jersey, and no appearances or answers were filed or served, the libelants attempted to enter a final decree on notice but were refused by the clerk. Subsequently application was made to the court for an order referring the cause to a commissioner. The application was heard on May 20, 1930, at which time National Sugar Refining Company of New Jersey only appeared and by its counsel unsuccessfully opposed the granting of the order by which on May 23, 1930, the court directed that this cause be referred to me as commissioner to ascertain the existence, nature, and extent of the libelants' lien herein and to ascertain and compute the amount of libelants' damages and report thereon to the court with all convenient speed.

On June 10, pursuant to notice, and on subsequent dates up to and including October 30, I was attended by Messrs. Haight, Smith, Griffin & Deming (Hebert M. Statt and Edgar R. Kraetzer, Esqs., Advocates), proctors for the libelants and by Henry F. Cochrane, Esq., proctor for National Sugar Refining Company of New Jersey, who presented evidence by the oral testimony of six witnesses; three called by the libelants and three by National Sugar Refining Company of New Jersey. The testimony of the witnesses and the proceedings had before me were reported by a stenographer and are contained in the minutes consisting of 194 typewritten pages which are filed herewith, together with libelants' and sugar company's exhibits admitted in evidence upon the hearings which have

been marked Exhibits 1–8, and A–K, respectively.

The order of reference apparently is in aid of Admiralty Rule 37 (formerly Rule 38), 28 USCA § 723, of the Supreme Court of the United States. American Steel Barge Co. v. Chesapeake & O. Coal Agency Co. (C. C. A. 1st 1902) 115 F. 669, 678. Pursuant to this rule, in proceedings in rem, any person charged with the possession of freight or other proceeds of property attached, by petition of an interested party, may be required to show cause why the same should not be brought into court to answer the exigency of the suit.

But it is suggested that the order of reference is broader than this and in effect requires me to hear and determine all issues involved in the suit. In my opinion, the language of the order affords some basis for this claim, which, however, it is unnecessary now to decide inasmuch as the parties who have appeared have stipulated that it shall be given such effect whatever may have been the original intention. Minutes, pp. 79, 80.

In the usual situation, in passing upon the evidence and the issues involved, the court has before it the pleadings in which the parties have set forth their respective contentions. However, in the present case, the task has been rendered somewhat more difficult by the circumstance that one claimant has not appeared at all and the other has filed no answer, relying upon the evidence and its oral and written arguments to explain its position.

This method of presentation is certainly open to objection and leaves much to be desired in the way of orderly procedure. However, in the absence of libelants' objection on this ground, I have received and considered evidence with respect to various defenses interposed by the sugar company several of which, if formally presented, should have been pleaded affirmatively. It is believed that the respective contentions of the parties have been made sufficiently clear by the evidence and the arguments of counsel; nevertheless as my decision herein will undoubtedly be reviewed, I shall have occasion to refer to them specifically later on in this report.

Having considered the evidence, briefs, and arguments of counsel thereon, I hereby further report as follows:

It appears that by charter party dated the 17th day of January, 1930, the owner of the Solhaug, through its New York agents and brokers, Bennett, Hvoslef & Co., Inc., time-chartered the Solhaug to Columbus Line, Inc., for one round trip to the West Indies within limits enumerated, not to occupy more than six weeks, and agreed to pay for the use and hire of said steamship the sum of $3,900 United States currency irrespective of steamer's total dead-weight capacity per calendar month, commencing on and from the date of her delivery and at or on the same rate for any part of a month; hire to continue until the hour and the day of her redelivery to the owner at a port in the United States north of Cape Hatteras at charterers' option.

The charter party was on the well-known government form and provided, among other things, as follows:

"5. Payment of said hire to be made in New York and in cash semi-monthly, in advance, and for the last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the charterers, without prejudice to any claim that they (the Owners) may otherwise have on the Charterers in pursuance of this charter. * * *

"18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter * * *."

The charter party further provided that the charterers shall have liberty to sublet the steamer for all or any part of the time therein provided, charterers, however, remaining responsible for its fulfillment; also that the captain shall prosecute the voyage with the utmost dispatch and that although appointed by the owners shall be under the orders and direction of the charterers as regards employment or agency; charterers to load, stow, and trim the cargo at their expense under the supervision of the captain who, it was provided, was to sign bills of lading in accordance with mates' or tally clerks' receipts. Libelants' Exhibit 1.

By charter party dated the 29th day of January, 1930, Columbus Line, Inc., subchartered the Solhaug to Agencia Cooperativa De Exportacion De Azucar S. A. (commonly known as the Single Seller Committee) for a voyage from one or two points on the north coast of Cuba, at the charterers' option, to New York. The subcharterer agreed to provide a full and complete cargo under deck of 35,000 bags of sugar in bags of about 320 pounds each and to pay freight thereon at the rate of 12 cents United States currency per

100 pounds, 75 per cent. in cash on the basis of gross bill of lading weight on arrival of vessel at discharging berth and on final discharge of cargo, any over or short payment to be adjusted on the gross landed weight as determined by public weighers' returns free of discount or interest at discharging berth.

The last-mentioned charter party further provided that the "vessel shall have an absolute lien on cargo for freight, deadfreight and demurrage." Bills for demurrage and/or dispatch, discharging, and wharfage were to be settled at time of final settlement of freight. Under the agreement the owner had the option of carrying the amount contracted to be carried in two steamers, which option was apparently exercised. Libelants' Exhibit 2.

I shall hereafter refer to the owner of the Solhaug as "Owner," Columbus Line, Inc., as "Charterer," the Single Seller Committee as "Subcharterer," and National Sugar Refining Company of New Jersey as "National." I shall also refer to the charter party of January 17, 1930, as "time charter" and to that of January 29, 1930, as "sugar charter."

Prior to the time that the sugar charter was entered into, National purchased from the subcharterer, through Minford Lueder & Co., brokers, the sugar, a part of which thereafter formed the cargo of the Solhaug now in question. The contract was verbal and was entered into on or about January 9, 1930. Smith, pp. 155–158. Whether the sugar was purchased on the basis of a loading or on arrival date was not made clear by the testimony. National, however, did not itself charter the steamer or steamers to lift the sugar which it apparently expected Minford Lueder & Co., the seller's broker, to attend to. Smith, pp. 158, 159.

The Solhaug was delivered by the owner to the charterer at 5 a. m. on January 22, 1930. What she did thereafter and until February 20th does not appear and is not material. On the latter date, however, at 1:50 p. m. she was placed on subcharterer's berth at Antilla, Cuba, ready for loading, which commenced the following morning at 7 a. m. The Solhaug loaded 18,398 bags of sugar and loading was completed at 4:40 p. m. on February 22d, all of which appears and has been indorsed upon the bill of lading issued by the master to the shipper of the cargo, the subcharterer. Libelants' Exhibit 8.

The bill of lading, although signed by the master, contains in the margin the following typewritten provision: "Amount of disbursements to be deducted $1,779.04, above amount to be deducted from freight." This was signed by Egan & Arrue, the charterer's agents. The document also contained many of the usual printed provisions, among others: "That the Carrier shall have a lien on the goods for all freights, primages and charges * * *." It did not incorporate by reference the terms of the subcharter; at least, the blank left for such reference was not filled in. Libelants' Exhibit 8.

Thereafter the Solhaug sailed from Antilla for New York, where she arrived on the morning of March 1, 1930, and docked at National's pier at 6:30 p. m. on March 3d. Discharging of the vessel's cargo commenced the following morning at 8 a. m. Candlish, p. 12.

On March 3d, the charterer presented to National a bill for $5,497.32 representing 75 per cent. of the freight payable on the basis of gross bill of lading weights, as per sugar charter, and on the following day National paid charterer the sum of $5,000, which charterer accepted and credited to National's account. Libelants' Exhibits 4 and 5; National Exhibit F. The Solhaug's cargo was discharged on March 4th and 5th and weighed by public weighers from whose certificate it appears that the gross outturn was 6,051,346 lbs. Libelants' Exhibit 6. On this basis final bill in the amount of $7,261.62 at the rate of 12 cents per 100 pounds was submitted to National by charterer on which was credited the earlier payment of $5,000, leaving an apparent balance due from National to the charterer as per sugar charter of $2,261.62. Libelants' Exhibit 7.

As above stated, the Solhaug was delivered to the charterer under the time charter at 5 a. m. on January 22, 1930. In accordance with the terms of said charter party, hire in the amount of $3,900 per calendar month less 2½ per cent. address commission was payable semimonthly in advance, beginning on said day and the same was paid covering the period up to the 22d day of February, 1930, at 5 a. m., at which time hire for the last half month became due and payable, for which amount the charterer was billed by the owner in advance on February 17th. Libel, p. 3; Mathews, p. 164.

The vessel was redelivered by the charterer to the owner at New York at 11 a. m. on March 5, 1930, but the charterer failed to pay hire from February 22, 1930, at 5 a. m. up to the hour and day of redelivery, or 11 days and 6 hours, which, at $3,900 per calendar month of 28 days, amounts to $1,566.95. Aft-

er deducting 2½ per cent. address commission amounting to $39.17 and 19 tons of coal on redelivery at New York at $5.75 per ton, or $109.25, it is claimed that there is a balance due the owner on account of said 11 days and 6 hours of $1,418.53, for which amount the owner seeks to assert a lien in these proceedings upon the freights or subfreights payable by National for the carriage of the sugar cargo. Libel, p. 3; Libelants' Exhibit 1.

National did not pay the charterer the balance of freight amounting to $2,261.62 immediately the gross outturn weights were determined and it has never paid the same as such. It appears, however, that on March 5th National received from Minford Lueder & Co. a letter quoting a cable from Cuba as follows: "Referring Solhaug eighteen thousand three hundred ninety eight bags Antilla please collect from National one thousand seven hundred seventy nine dollars nine cents amount disbursements Antilla and advise when collected placing this amount to our credit." The letter asked National to give this request its prompt consideration. And again on March 7th National received a further letter quoting two additional cables from Cuba with reference to the same matter. While the evidence does not establish clearly the origin of these cables, it is a fair inference that they were received from Messrs. Egan & Arrue. National Exhibits J and K.

It does not appear what, if anything, was immediately done in connection with these requests; but the evidence discloses that Mr. Egan, one of the partners of Egan & Arrue, was in New York and was in touch with National which on March 18 paid to his firm by check the amount of $1,779.04 representing disbursements incurred in loading the Solhaug at Antilla. National Exhibits H and I. It appears further that on March 17th a general settlement was effected of National's account with charterer (covering this and other vessels) whereby National was credited on the Solhaug with $3,811.14, said sum being made up as follows: $1,779.04 disbursements at Antilla, $235.76 and $73.90 representing dispatch claimed to have been earned in loading at Antilla and discharging at New York, respectively, $1,677.72 stevedoring charges in connection with the discharge of cargo at New York, and $44.72 wharfage at New York. National Exhibits D and E.

The disbursements and charges at Antilla represented by the item of $1,779.04 apparently cover inward and outward pilotage, docking charges, tonnage dues, cables and telegrams, telephone calls, custom house visit and dispatch, consul fees, boat hire and running lines, agents' fees, stevedores, tallymen, winchmen, advances to master, wharf hire, marine pension law, government tax on sugar freight, labor, compensation insurance, and agents' commissions on disbursements. National Exhibit A.

While these negotiations and arrangements were being made, the owner's agents, Bennett, Hvoslef & Co., Inc., were in daily touch with the charterer, Columbus Line, Inc. The excuse offered the owner's agents by the charterer for its failure to pay the charter hire due on February 22d was that the steamer was on her last half month and would be redelivered within that period and the charterer, therefore, wished to withhold payment until the amount of disbursements chargeable to the owner and the coal and bunkers on redelivery were established. Mathews, pp. 166, 167.

Apparently the owner's agents continued to request payment but on every occasion were given a similar answer. On March 26th, however, the charterer informed the owner's agents that owing to its financial condition it would be unable to pay the balance of hire due and requested an extension. On that day, the agents notified the owner by cable and upon receipt of instructions placed the matter in the hands of their New York counsel, who thereafter commenced this suit. Mathews, pp. 166–172.

It further appears that the owner and charterer had had some controversy in connection with a previous charter party and that an action had been brought by the owner against the Columbus Line, Inc., in the City Court, New York County, on or about March 7th by service of an attachment on National and on Columbus Line, Inc. Statt, p. 203; Vreeland, p. 88. The nature of this action and the circumstances thereof are not material here except as they establish that National had notice that the charterer was not the owner of the Solhaug.

The libelants contend that the cargo was bound to the vessel for unpaid charter hire, at least to the extent of the freight payable by the cargo owner. This liability of the cargo, it is said, is based upon accepted principles of maritime law. It is also claimed that each of the agreements in this case provides for a lien on cargo running in favor of the carrier, vessel, or owner, which lien libelants assert they are entitled to enforce against cargo or against freight as a substitute for cargo either in their own right or by subrogation to the rights of the charterer. And

finally it is contended that libelants have an express lien on subfreights including the freight payable by National. This lien, it is claimed, is prior in time and is superior to any lien or other claim asserted by National.

On the other hand, National contends that it is not bound by the terms of the time charter of which it had no knowledge; that it has paid in good faith without notice of libelants' lien all freight for which it is liable under the bills of lading and sugar charter either directly to the charterer or by payments for its account; that payment by it of the disbursements at Antilla was expressly authorized by the bills of lading signed by the master; and that in any event as such disbursements and the expense of discharging the cargo at New York were necessary in order to enable the vessel to earn freight, it is entitled to set them off against the balance of freight unpaid and against the libelants' claim herein.

Upon the hearings and in the written and oral arguments of counsel much has been said with respect to the libelants' alleged lien on cargo or on freight as a substitute for cargo and as to the history and origin of such lien or liens which it seems unnecessary to do more than refer to for the reason that in the libel and in the proceedings had before me, libelants have not sought to enforce a lien on cargo but on freights or subfreights which it is said remain unpaid in the hands of National.

The libel is based, and in my opinion libelants' case rests, upon the language of the time charter: "That the Owners shall have a lien on all cargoes and on subfreights at any amount due under this Charter." It is also unnecessary for me to review the origin of this clause, with respect to which there is apparently some doubt, which has been extensively reviewed elsewhere. It is enough to state that the same clause has been heretofore approved by the courts and under sufficiently similar circumstances has been held to entitle the owner to enforce its lien for unpaid charter hire against the freight payable by cargo owner. American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., supra.

■ This lien does not depend upon any right which the owner may have to proceed against the cargo or upon the possession thereof, but upon the agreement of the parties creating it. U. S. v. Freights, etc., of The Mt. Shasta, 274 U. S. 466, 47 S. Ct. 666, 71 L. Ed. 1156, 1927 A. M. C. 943, and cases cited therein. Possibly the language of the time charter merely reaffirms a right which the owner already had; if so, that is an additional reason for holding as I do that the libelant-owner has a lien which it may assert herein unless the owner's lien is subordinate to some lien or other right of the cargo or it is shown that the cargo owner for other reasons is not bound thereby or it is inequitable to allow libelants to enforce the same.

As I have stated, National contends that the disbursements at Antilla and New York were necessary to enable the vessel to earn freight and therefore that it was justified in paying the same and in deducting such payments from the balance of freight payable by it. The legal grounds upon which this claim is based have not been made clear, but it may be presumed that it is claimed that the payments were made upon the credit of the steamer and her freights. In this connection National's counsel refers to American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., supra, and particularly to the language of the court appearing at page 676 of 115 F.

But under the sugar charter as well as under the time charter, it was the duty of the charterer, Columbus Line, Inc., to pay operating and other expenses of the Solhaug with the exception of the wages of the master and crew and the expenses of their maintenance, and so far as the Antilla disbursements are concerned, it may be said that they were so paid inasmuch as it is clear from the testimony of Egan that settlement of such disbursements in the first instance was made by Egan & Arrue, the charterer's agents. Moreover, it is plain from the testimony of the same witness that the disbursements in question or most of them were never made upon the credit of the steamer but upon that of Egan & Arrue and the bond which they were required to post as a condition of transacting business at Antilla.

The only expenses at New York which were paid by National were a small bill for wharfage and the stevedoring charges incurred in the discharge of the Solhaug's cargo. As has already been observed, the obligation to pay such expenses rested with the charterer. To be sure the sugar charter gave National as subcharterer's agent the option of appointing the stevedores, but this did not alter the liability of the vessel—in this case the charterer—to pay for the same. In any event, there is no evidence in this case to show that the wharfinger or the stevedore relied on the credit of the steamer in supplying the facilities and services in question.

■ National admits that it had a copy of the sugar charter. The sugar charter disclosed that the charterer was not, or at least might

not be, the owner of the Solhaug, which fact could easily have been established by questioning the charterer, the master, or the owner's agents, all of whom it is shown, or it may fairly be assumed, had copies of the time charter. Under these circumstances it is my opinion that reasonable diligence required such inquiry to be made, and since it is clear that such a course, if adopted, would have disclosed that the charterer or its agents were without authority to bind the vessel, no lien arose which National is entitled to assert either in its own right or by subrogation to the rights of others. Act of June 5, 1920, ch. 250, § 30, subsecs. P–R (46 USCA §§ 971–973); United States v. Carver (1923) 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361.

■ Even though it may be assumed that under other circumstances the rendering of certain of the services herein might have given rise to liens against the vessel in favor of National by subrogation to the rights of those by whom they were furnished, nevertheless even accepting a most liberal view of the order, pleadings, and the stipulation of counsel herein, as the Solhaug is not a party to this suit, I am clearly of the opinion that I am without authority to determine her liability, if any, in these proceedings.

[4, 5] The most difficult questions in this case arise out of National's claim that it paid all freight in good faith without knowledge of the terms of the time charter or of the owner's lien. This claim raises the question, among others, whether National is bound by the time charter, which in turn depends (in a case like this where cargo owner is merely the holder of the bills of lading or at the most a subcharterer) upon whether National had knowledge, actual or constructive, of its terms. Poor on Charter Parties (2d Ed.) § 25, pp. 59, 60.

I confess that when the question was first presented I entertained some doubt as to whether National was chargeable with such notice for the reason that the blank provided in the bills of lading for incorporating the terms of the sugar charter was not filled in and so far as appeared there was no basis for charging National even with constructive notice of the terms of any other agreement. This difficulty has been overcome, however, by evidence of the origin and course of the transaction and by National's admission that it had a copy of the sugar charter and considered itself bound by its terms. Elliott, pp. 148, 150–153; Smith, pp. 155–161.

I have previously referred to the fact that the sugar charter referred to the charterer as "owners or chartered owners." It is possible that this designation in itself would not be sufficient to put an inexperienced shipper on notice to inquire further—I do not decide that —but I am of the opinion that this excuse is not available to so important an importer of sugar as National, particularly as it is common knowledge that a very considerable amount of Cuban sugar is moved in chartered tonnage.

Furthermore, since the vessel discharged this sugar at National's Refinery, National must certainly have known that the Solhaug was a foreign vessel and therefore that it was unlikely that she was owned by the Columbus Line, Inc., an American corporation. But beyond that National had definite and express notice that the charterer was not the owner from the attachment in the City Court action brought by the owners very shortly after the Solhaug's arrival at New York.

In principle the situation is not unlike that in Jebsen v. A Cargo of Hemp (D. C. Mass. 1915) 228 F. 143, 147, which was a case of a time charter and a subletting by a similar time charter thereunder. The charter contained the usual provisions as to use, and among other things provided that "the owner shall have a lien on all cargoes for freight or charter money due under this charter." In the subcharter, the original charterer was described as a "time charterer." The subcharterer paid the charterer all hire due from it for the use of the vessel. But the latter failed in its obligation to pay hire to the owners who thereupon libeled the cargo. The issue was between the owners of the vessel and the subcharterer, each claiming that it was entitled to the freight payable by the cargo.

In that case the court decided that the owners were entitled to maintain and enforce the lien on cargo for the purpose of enabling them to recover the charter money due from the charterer. There, as here, there were previous legal proceedings or threats of the same which, in addition to the designation in the subcharter, tended to put the subcharterer on notice that the charterer was not in fact the owner, and is was claimed that payment by the subcharterer to the charterer gave rise to an equity in favor of the former.

The court, however, held that payment was made at the risk of the subcharterer, which was required as a matter of business prudence to examine the first charter and to govern itself by its terms including that re-

serving to the owners a lien on "all cargoes." In this case also it is my opinion that reasonable business foresight and caution required that National inquire further before paying the freight over to the charterer at New York or in any event before undertaking to pay charterer's own indebtedness to third parties. See, also, Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; The Albert Dumois (D. C. 1893) 54 F. 529; Wehner v. Dene S. S. Co., Ltd., [1905] 2 K. B. 92.

But National earnestly contends that it is inequitable to allow the owner to succeed herein inasmuch as the owner did nothing to assert its lien until April 7th, over a month after the cargo had been discharged and the steamer redelivered to her owners. The exact legal grounds upon which this defense is based have not been pleaded nor have they been made clear by counsel. If I may be permitted to hazard a guess based upon arguments of counsel, I should be inclined to hold that National's position involves elements of three defenses—laches, waiver, and estoppel. It is often difficult to distinguish among the foregoing defenses which are frequently run together. In this connection I refer to Berwind-White Coal Mining Co. v. Metropolitan S. S. Co. (C. C. 1909) 173 F. 806, which contains an excellent statement on this subject.

I am satisfied in this case that there was no waiver of the owner's lien in this case as waiver, as I understand it, involves intention. While Mathews, a minor officer of the owner's New York agents, testified that they did not look to National for the payment of charter hire, nevertheless I am of the opinion that there was never any intention on the part of the owner's agents and certainly not on the part of the foreign owners themselves to waive lien on subfreights. In any event the burden is on National to prove waiver, The President Arthur, 1927 A. M. C. 73, 78, and in this case the burden has not been sustained.

In my opinion the real basis of National's complaint is estoppel or rather equitable estoppel which rests upon the rule of one party lying by and allowing an innocent party to acquire a supposed right to his prejudice. But whether or not National has been prejudiced depends in part upon the duties placed upon it—in the present case whether there was any duty on the part of National to inquire and whether such inquiry would in fact have put it on notice of the owner's claim and lien. I have already stated that in my judgment such a duty existed and that reasonable inquiry would have avoided any possibility of National's being misled as to the owner's rights. One of the essential elements of estoppel therefore does not here exist.

My opinion in this respect is made somewhat easier by the events that transpired after the Solhaug's arrival at New York and the discharge of her cargo. I have previously referred to the fact that the disbursements indorsement on the bill of lading was signed by the charterer's agents although the bill of lading itself was signed by the master. The form of this indorsement in my opinion was sufficiently unusual to warrant further inquiry. National, moreover, should have been warned by the apparent anxiety of the charterer's agents, as evidenced by their cables quoted in letters of Minford Lueder & Co. and by the personal attention given to the matter by Mr. Egan. After all, the obligation of National was to pay freight, without credit or discount, immediately upon the landing of the goods, not to pay the charterer's obligations.

I have not overlooked the fact that Mr. Elliott, National's shipping man, testified that he did not know who were the owners of the Solhaug and that the only documents with which he was concerned were the subcharter and the bill of lading. Such testimony, however, does not help the position of National if, as I am compelled to hold on this evidence, he should have known and inquired further. That such inquiry during the period when Columbus Line, Inc., was putting off the owner could not have failed to disclose the true situation and would have resulted in the owner's asserting its lien at an earlier date seems to me plain.

In reaching this conclusion I do not wish to be understood as implying that there was any collusion between National and charterer and its agents, although good faith cannot be imputed to the charterer if the testimony of Mathews, an officer of the owner's agents, may be accepted with respect to the representations made to him by the charterer. Mathews, pp. 168, 170, 171, 180–188. If Mathews is correct, Columbus Line, Inc., was attempting to effect a preference in payment of certain of its creditors to the detriment of the claim of the owners of the Solhaug which cannot now stand.

I come therefore to the conclusion that the owner of the Solhaug is entitled to enforce its claim for balance of charter hire due up to 11 a. m. on March 5th less certain deductions which I am about to refer to. I have not

302

reached this conclusion without some hesitation as the result in effect requires National to pay twice and seems a little hard. On the other hand, on the basis of the showing made by National I am not prepared to go to the extent of holding that the owner has lost by its conduct what in my opinion must be considered a clear legal right.

The remaining question relates to the amount which the libelants are entitled to recover. The libel alleges that the libelants are entitled to charter hire from 5 a. m. on February 22d to 11 a. m. on March 5, 1930, which period I find to be correct. According to the time charter hire was payable at the rate of $3,900 per calendar month. The libelants have taken a 28-day in computing the daily rate and have applied this rate to the entire period, part of which fell in February and part in March. They should have applied a lower rate for the month of March which contains 31 days.

The entire period was 11 days and 6 hours, of which 6 days and 19 hours were in February and pay hire at the rate of $139.29 per day, or $945.94, and 4 days and 11 hours in March and pay at the rate of $125.81 per day or $560.88, or together a total of $1,506.82. From this has been deducted 2½ per cent. address commission of $37.67 ($39.17 claimed in libel) and 19 tons of coal on redelivery at New York at $5.75 per ton, or $109.25, both undisputed, leaving an apparent balance due from the charterer and from National to the owner of $1,359.90.

■ I am also of the opinion that National is entitled to two further deductions. Under the sugar charter, subcharterer was entitled to dispatch if earned and indorsed on the bill of lading. This was an agreement the charterer was entitled to make which is as binding on the owner as the agreement with respect to the amount of freight payable of which it is in effect a part. The Albert F. Paul (C. C. A. 2d 1924) 1 F.(2d) 16. The amount of dispatch was not indorsed on the bill of lading, but all the time data necessary for its computation is available, and in the case of the Antilla dispatch appears on the face of the bill of lading itself. On the basis of this evidence I therefore find that National is entitled to a credit of $235.76 for dispatch earned at Antilla and of $73.90 for that earned at New York.

■ It also appears from the testimony that the charterer's agents advanced to the master at Antilla the sum of $100 for various purposes connected with the crew. It is admitted that this is a proper deduction and that it has not heretofore been allowed. I am therefore of the opinion that this advance should be taken into consideration, not by way of set-off on the part of National, but in reduction of the owner's claim for hire. Molthes Rederi Aktieselskabet v. Ellerman's Wilson Line, Ltd., 32 Com. Cas. 106,115.

Upon the hearings I reserved decision with respect to several motions made by the libelants to strike out evidence submitted by National concerning the payment of Antilla and other disbursements and the crediting of dispatch. These motions were based upon the claim that the evidence was incompetent, irrelevant, and immaterial. Except in the case of the dispatch, any questions of incompetency have been removed by stipulation. The evidence certainly is not irrelevant and while, in view of the result I have reached some of it may not be, strictly speaking, material, nevertheless it is material to a clear understanding of National's position. I therefore deny libelants' motions to strike out the testimony showing the payment of Antilla and New York disbursements. If I am right in my final decisons, no harm is done; if I am wrong, the evidence is available in support of National's defense.

I had originally understood that it was the intention of libelants' counsel to waive all questions relating to the competency of National's evidence, but apparently this waiver did not extend to the evidence submitted with respect to the earning and allowance of dispatch. On a strict application of the rules of evidence, some of the evidence in this connection possibly may be open to objection on the ground of incompetency. However, on consideration of the entire evidence offered on this subject, I am of the opinion that the dispatch earned at Antilla and at New York is sufficiently established and I therefore deny the motion to strike out.

National objected to the testimony of Mathews with respect to alleged custom of charterers to withhold payment of final installment of hire until after all expenses and disbursements are known and charterer has prepared final account and moves to strike out such testimony. This evidence was offered in explanation of libelants' failure to press the claim earlier. I doubt whether the evidence is sufficient to establish custom, but it is informative as explaining libelants' forbearance in the present case. I therefore allow it to stand. National, however, is not prejudiced by my ruling inasmuch as the evidence

has not in any way entered into the result herein.

The facts upon which my decision is based appear in this report particularly on pages 1–12 and 22–24. It is believed that my findings are a sufficient compliance with Rule 46½ of the Rules in Admiralty (28 USCA § 723).

As conclusions of law, I find as follows:

(1) The libelant-owner under the time charter herein has a valid lien upon all subfreights for any amounts due under this charter, which lien dates from the time the said charter was entered into and is enforceable against all such freights payable by parties having actual or constructive notice of its terms.

(2) National is chargeable with constructive notice of the terms of the time charter and of the owner's lien, and is therefore bound by such terms in the payment of freight.

(3) Having constructive notice of the owner's lien and without reasonable inquiry paid freight to and for account of the charterer, National must be deemed to have made such payments at its peril, and, so far as affects the claim of the owners herein, they cannot be considered as an effective discharge of its obligation to pay freight.

(4) The payment by National of the Antilla disbursements created in its favor only a general right of set-off which it is entitled to exercise against the freight payable by it subject, however, to the owners' lien for unpaid charter hire. Whether such payment gave rise to a lien on the vessel either directly or by subrogation to the rights of others need not be decided, as National is not entitled to enforce any such lien in this proceeding.

(5) The owner has not waived its lien on subfreights, nor is it estopped to enforce the same against the freight payable by National because of its failure earlier to act.

(6) There are no other equities which National is entitled to enforce in priority to the owner's lien.

(7) Deductions for dispatch earned at Antilla and New York and cash advanced to the master are allowed, not by way of set-off but in reduction of the owner's claim.

I therefore find and report that after the allowance of the deductions above referred to, $950.24 is payable to libelants as hire for the use of the Solhaug up to and including 11 a. m. on March 5, 1930, to recover which libelants are entitled to enforce the owner's lien against the freight moneys payable by National for the transportation of the Solhaug's cargo.

New York, January 13, 1931.

Respectfully submitted,

Ralph W. Brown
Special Commissioner.

Report confirmed February 14, 1931, by PATTERSON, District Judge.