320 F.2d 628
 Edward SCHILLING, Trustee of North Atlantic and Gulf Steamship Company, Incorporated, and Nortropic Shipping Company, Incorporated, Debtors, in Reorganization pursuant to Chapter X of the Bankruptcy Act, Appellants,
v.
A/S D/S DANNEBROG et al., Appellees.
 No. 363.
 Docket 28084.
 United States Court of Appeals Second Circuit.
 Argued May 28, 1963.
 Decided July 5, 1963.
 
 Milton M. Bergerman, New York City (Bergerman & Hourwich, Joseph Calderon, Albert F. Reisman, New York City, of counsel), for appellant.
 Richard T. O'Connell, Healy, Baillie & Burke, New York City, for appellees National Shipping & Trading Corp. and Arequipa Compania Naviera S. A.
 Samuel Rosenbloom, New York City (Joshua Morrison, Sidney S. Goldstein, New York City, of counsel), for appellee Ocean Tramping Corp.
 Paul F. McGuire, Kirlin, Campbell & Keating, New York City, for appellees Adra, etc.
 Charles S. Haight, Jr., New York City (Haight, Gardner, Poor & Havens, John C. Moore, New York City, of counsel), for A/S D/S Dannebrog, Orvigs D/S A/S, I/S Norlindo, A/S D/S Neptun, D/S A/S Imica, and Rederi A/B Sigyn.
 Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 In an opinion reported in 204 F.Supp. 899, Judge Bryan laid down general principles to guide the resolution of a complex of claims by owners of vessels that had been time-chartered to the bankrupt, North Atlantic and Gulf Steamship Company (Norgulf), by stevedores who had rendered services to the chartered vessels, and by Norgulf's trustee in bankruptcy. The quality of his opinion, apparent from a reading of it, is even more impressively attested by the absence of appeal from any but two of the fourteen issues he decided.[1] Although both these issues are, so far as we have been able to discover, of novel impression, and they seem somewhat more difficult to us than they did to Judge Bryan, we think he reached the correct results.
 
 I.
 
 2
 The time charters, which were the standard New York Produce Exchange Form, provided that charter hire should be paid semi-monthly in advance and, in Clause 18,
 
 
 3
 "That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average Contributions, and the Charterers to have a lien on the Ship for all moneys paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once."
 
 
 4
 The present question concerns cases where the vessels were turned back to the owner, prior to the filing of the petition in bankruptcy, after an installment of charter hire had come due and not been paid but before the semi-monthly period to which it related had expired. The owners claimed, and the District Judge held, that they were entitled to liens against the sub-freights for the full amounts of the unpaid installments. The trustee contends that the lien should be for only a fraction of the last unpaid installment, with the period of actual use by the debtor the numerator and the half-month the denominator. He relies on what he considers to be the equities, and on the authority of Jebsen v. A Cargo of Hemp, 228 F. 143, 149 (D.Mass. 1915), and Wehner v. Dene Steam Shipping Co. [1905], 2 K.B. 92, 101-02.[2]
 
 
 5
 These two decisions did reduce the lien for the last unpaid installment to an amount proportional to the period of the charterer's use. See also Italian State Railways v. Mavrogordatos [1919], 2 K.B. 305; Scrutton, Charterparties (16th ed. McNair & Mocatta, 1955), at 408; Carver, Carriage of Goods by Sea (10th ed. Colinvaux, 1957), at 272. But see Leslie Shipping Co. v. Welstead [1921], 3 K.B. 420, where an apparently inconsistent result was reached, without discussion. But all those cases differed from the instant one in a respect which the owners claim and Judge Bryan held to be vital. In each of them the owner had withdrawn the vessel for nonpayment of the installment, whereas here the already defaulting charterer took the initiative and returned the vessel prematurely, in breach of the charter. The language of the Wehner case, that the owner did not have "the right to retake possession in the middle of the half-month, and also to claim the hire for the whole of that period," and of the Jebsen case, that as a result of the owner's action, "the vessel was in fact withdrawn from the service of the [charterer]," is thus not exactly applicable; neither is the statement in Italian State Railways that "It would be strange if the law should allow the owner to withdraw his ship on January 11 and yet claim payment of a full month's hire in advance dating from 10 P.M. on the previous day."
 
 
 6
 Where leases of real estate are involved, the tenant's surrender of the premises, even when it is accepted by the landlord and hence terminates the lease, does not relieve the tenant from liability for an installment of rent which has previously come due in advance for a period extending beyond the acceptance of the surrender. Sperry v. Miller, 8 N.Y. 336 (1853); Barkley v. McCue, 25 Misc. 738, 55 N.Y.S. 608 (1899); Hampton v. Flesser, 133 Misc. 705, 232 N.Y.S. 641 (1929); Petrelli v. Kagel, 37 Misc. 2d 246, 235 N.Y.S.2d 383 (N.Y.C.Civil Ct. 1962). But in contrast to a demise charter, see Gilmore and Black, Admiralty (1957), 215, the landlord and tenant analogy is not entirely apt as applied to an ordinary time charter, where, as pointed out in the Italian State Railways case, supra, the vessel has always been under the direction of the owner's master. It might be argued that, if a time charter is thus treated as a simple bilateral contract rather than as a lease, the breach of contract resulting from a turn-back of the vessel "merges" the past-due installment of charter hire into an over-all claim for damages in the amount of the excess of the hire for the unexpired term of the charter, starting with the date when the installment was due, over the value of the use of the vessel to the owner for the same period — an unliquidated claim not contended by the owners to be comprehended within Clause 18. Compare Freights of the Kate. 63 F. 707, 723 (S.D.N.Y.1894). However, as pointed out in 4 Corbin, Contracts (1951), §§ 955-57, the rule against "splitting a cause of action" should not be applied in a mechanical fashion and without regard to the reasons that underlie it. Here the owner had contracted for a lien against subfreights for unpaid installments of charter hire; we see no reason why the law should force him to forego that remedy and merge his secured claim for an installment that accrued before the turnback with his unsecured claim for damages arising from the charterer's later complete breach — even when, unlike the owners in the Jebsen, Wehner and Italian State Railways cases, he has taken no affirmative action that might be thought to evidence an election to forego his claim for charter hire from the date of such action and to rely solely on his claim for damages but has simply accepted a return of the vessel voluntarily tendered by the charterer, which he could not well refuse. The result might be different if, from rechartering the vessel or otherwise, the owner realized more than the total amount remaining due under the charter, including the unpaid installment. Cf. S & W Holding Co. v. Kuriansky, 317 F.2d 666 (2 Cir. 1963). But no one asserts this to be such a case. Still another question is whether the amount of the lien for an unpaid installment should be reduced if the owner got some value out of the vessel during the period covered by the installment. If the facts here present that issue, we do not understand Judge Bryan's opinion to have ruled upon it.
 
 
 7
 Our ruling here is in no way inconsistent with our recent decision in S & W Holding Co. v. Kuriansky, supra, that the landlord of a bankrupt could not apply a security deposit to the entire amount of the rent that became due on the first day of the month in which bankruptcy occurred, in a situation where he was entitled to recover from the trustee for use and occupancy from the date of bankruptcy and suffered no damages from breach of the lease. We held long ago in a case cited with approval in S & W Holding Co., that where a trustee had ceased to occupy the premises leased by the bankrupt, the lessor was entitled to apply a security deposit against rent accruing even after bankruptcy but before acceptance of a surrender. In re Sherwoods, 210 F. 754, 761 (2 Cir. 1913).
 
 II.
 
 8
 Clause 3 of the charters provided that "the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports * *." In cases where the redelivery was subsequent to the bankruptcy, Judge Bryan upheld the trustee's contention that since the fuel on board was his property, the owners' obligation to pay for it ran to him and could not be set off, under § 68 of the Bankruptcy Act, against the owners' unsecured claims; this ruling has not been appealed. However, the judge reached an opposite conclusion and allowed such set-off as to fuel on board vessels redelivered prior to the bankruptcy; from that ruling the trustee appeals. The question for our decision is stipulated to be:
 
 
 9
 "Is the value of fuel on board a chartered vessel at the time of the vessel's premature return by the charterer to the ship-owner, in breach of the charter party, an offset against the amount of the maritime lien of the shipowner; or is it an offset against the shipowner's claim for damages for breach of charter?"
 
 
 10
 The "maritime lien of the shipowner," as the context makes clear, is the lien we have just discussed — the one given by Clause 18 against cargoes and subfreights for charter hire unpaid at the time of redelivery.
 
 
 11
 The trustee does not contend, as we understand him, that if the claim for fuel under Clause 3 was unsecured, he would be entitled to apply it in reduction of the owners' secured claim for charter hire under Clause 18; his contention is rather that the claim for the value of fuel on board was secured by a maritime lien on the vessels in favor of the charterer, and that it therefore may be set off by the bankrupt estate against claims secured by liens on the sub-freights. Accepting the second proposition as resting on a sound practical basis, cf. S & W Holding Company v. Kuriansky, supra, 317 F.2d at 666, we think the trustee's case fails on the first.
 
 
 12
 The trustee's initial reliance is on the Maritime Lien Act, 46 U.S.C. § 971, which gives a maritime lien to "Any person furnishing * * * supplies * * * to any vessel * * * upon the order of the owner of such vessel, or of a person authorized by the owner * * *." A claim for such a lien by the actual supplier of the fuel would not be precluded by the provision in Clause 2 of the charter that "the Charterers shall provide and pay for all the fuel except as otherwise agreed," Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 275, 60 S.Ct. 937, 941, 84 L.Ed. 1197 (1940), and if that were the only relevant provision the charterer might well argue that, having paid off the supplier, he is subrogated to the latter's lien. See Rodriquez v. The G. K. Dauntless, 70 F.Supp. 958 (S.D.Fla.1947); The Maret, 145 F. 2d 431, 444 (3 Cir. 1944). But 46 U.S.C. § 973 provides that "nothing in this chapter shall be construed to confer a lien when the furnisher knew * * * that because of the terms of a charter party, * * * the person ordering the * * * supplies * * * was without authority to bind the vessel therefor," and Clause 18 of the present charter states that "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." Such a clause is sufficient to preclude a lien in a supplier who knows or should know of its existence in the charter. United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923); Signal Oil, supra, 310 U.S. at 275, 60 S.Ct. at 941; Gilmore & Black, Admiralty (1957), at 566. It thus must be a fortiori sufficient to prevent the purchaser of fuel from creating a lien in the charterer himself, whether this is claimed directly — in the teeth of his agreement to provide the fuel himself — or by subrogation to the rights of a third-party supplier. See Pensacola Shipping Co. v. United States Shipping Board, 277 F. 889, 893 (5 Cir. 1922).
 
 
 13
 The trustee also argues that even if a lien did not arise when the fuel was procured for the vessels, one sprang into existence when they were turned back with fuel on board, in view of the owners' contractual obligation to pay for the fuel at that point.[3] This position might seem supported by the statements in Gilmore & Black, supra, that "Most, but not all, maritime claims give rise to liens," at 512, and, more specifically, that "liens arise for breach of charter-party in either direction. The charterer has a lien on the vessel for owner's breach; the owner may have a lien on cargo and sub-freights for charterer's breach * * *." At 517. It has the important backing of Judge Hough's decision in The Oceano, 148 F. 131 (S.D.N.Y.1906), recognizing a lien for a charterer's advances for a vessel's disbursements where the advances by error had not been deducted from the charter hire, and stating, 148 F. at 133, that
 
 
 14
 "As soon as the performance of a charter party is commenced a lien exists on the vessel in favor of the shipper or charterer, and a suit in rem may be maintained for any liability of the master or owner arising therefrom. * * * Damages sustained by a charterer through breach of a charter contract constitute a lien on the vessel. * * * It cannot be denied that unless explicitly excluded by the contract of charter party both shipper and owner may pursue their remedies for breach of contract by actions in rem."
 
 
 15
 We thus do not find the absence of an explicit charter provision conferring a lien for breach of the owner's obligation under Clause 3 so persuasive against the trustee as Judge Bryan did — even in the face of the provision in Clause 18 specifically giving the charterer a lien "on the Ship for all monies paid in advance and not earned. * * *"[4] Neither do we think that a lien in favor of the charterer for amounts contracted by the owner to be paid for fuel on board at the time of redelivery would be excluded in a proper case by the "Charterers will not suffer" provision of Clause 18 quoted above. For we agree with Judge John R. Brown that the usual prohibition of liens clause "does not undertake to deal with the power of the owner himself to subject his vessel to maritime liens," Roberts v. Echternach, 302 F.2d 370, 372 (5 Cir. 1962) — in that case also in favor of a charterer. See also New York Trust Co. v. Bermuda-Atlantic S. S. Co., 211 F. 989, 999 (S.D.N.Y.1913).
 
 
 16
 Where the trustee's case fails is in the absence of any sufficient proof of default by the owner under Clause 3. This is not like The Oceano, where the full charter hire was paid and the ship returned at the agreed time and the owner then defaulted on his obligation to pay a certain amount or to credit this against the charterer's final payment. Here, when the ships were turned back, the owners had claims for unpaid charter hire and the very act of redelivery created substantial claims on their part for damages. The owners did not refuse to pay for the fuel in any real sense, see note 3 supra; they simply asserted the right to pay by applying the value of the fuel against their own larger claims against Norgulf arising out of the same act of the charterer. A system so devoted to equitable principles as the admiralty, see Swift & Co. Packers v. Compania Colombiana, 339 U.S. 684, 689-694, 70 S.Ct. 861, 94 L.Ed. 1206 (1950), would scarcely create a preferred claim in favor of a charterer against the ship when the very act giving rise to that claim created a larger, unpreferred claim against the charterer by the owner, and when the effect of giving the defaulting charterer a lien against the ship would thus be to defeat the owner's equitable right to set off a related claim. Contrast United States v. Isthmian S.S. Co., 359 U.S. 314, 79 S.Ct. 857, 3 L.Ed.2d 845 (1959). Nothing to the contrary was decided in The Solhaug, 2 F.Supp. 294, 302 (S.D.N.Y.1931), where Judge Patterson affirmed a comprehensive report of Ralph W. Brown, Esq., as Special Commissioner, allowing the charterer to apply his claim for fuel on board in reduction of the owner's lien on subfreights for accrued charter hire; this point does not seem to have been contested there, and it does not appear that the owner was asserting any claim other than that secured by the lien on the subfreights.
 
 
 17
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Since the order was made "in proceedings in bankruptcy," it is appealable despite its interlocutory character, Bankruptcy Act, § 24a
 
 
 [2]
 The trustee does not dispute Judge Bryan's holding that, to the extent that the owners have valid maritime liens, these are not liens "obtained by attachment, judgment, levy, or other legal or equitable process or proceedings within four months before the filing of a petition initiating a proceeding under this Act" under § 67, sub. a(1) of the Bankruptcy Act. See 4 Collier, Bankruptcy (Moore ed. 1962), at 48-49
 
 
 [3]
 Appellees have not contended that the charterer's wrongful turnback of the vessels, by changing the time and place of redelivery and presumably increasing the amount of fuel on board and hence the amount owing for it, affected their obligation to pay for all the fuel on board at the current prices in the respective ports. The brief of appellees A/S D/S Dannebrog et al. states: "Appellees never denied that they were obligated for the amounts due under this clause (even though debtor's redelivery of the vessels was not as contemplated in the contracts, being premature and in breach thereof). In each case, appellees included an appropriate credit against their general claims for breach of charter."
 
 
 [4]
 The parties have not argued, and we have not considered, the bold suggestion made in Gilmore & Black, supra, at 539, that the Maritime Lien Act now affords the sole source of maritime contractual liens, with "non-statutory general maritime liens all but forgotten." But compare Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 11-12, 41 S.Ct. 1, 65 L.Ed. 97 (1920); 1 Benedict, Admiralty (6 ed. 1940), at 272